**STATE of Missouri, Respondent,**

v.

**Harold E. HEDRICK, Appellant.**

**No. WD 42273.**

Missouri Court of Appeals,
Western District.

Sept. 25, 1990.

Motion for Rehearing and/or Transfer
to Supreme Court Denied
Oct. 30, 1990.

Leon Munday, Kansas City, for appellant.

William L. Webster, Atty. Gen., Robert P. Sass, Asst. Atty. Gen., Jefferson City, for respondent.

Before KENNEDY, P.J., and SHANGLER and GAITAN, JJ.

KENNEDY, Presiding Judge.

Defendant Harold E. Hedrick was convicted upon jury trial of first degree sexual abuse, § 566.100, RSMo 1986, and two counts of sodomy, § 566.060, RSMo 1986. The alleged pathic was his daughter, T.H., ten years of age at the time the abuse allegedly occurred. Defendant was sentenced to three consecutive terms of five years on the respective counts.

On appeal defendant claims the court erred in restricting his impeachment of T.H. Defendant offered to show, by cross-examination of T.H. and by extrinsic evidence, a long history of conflict among himself, T.H.'s mother and custodial parent, and defendant's mother, Marianna Houston, with respect to T.H.'s custody, support and visitation. The trial court ruled such evidence off limits upon the State's in limine motion. According to defendant, such evidence would have impeached T.H. by showing on her part a motive for fabricating the incident of which defendant was accused. Defendant claims also that the court erred in allowing the mid-trial amendment of the information to change the date of the alleged offense from July 15–17, 1988, to June 11—July 17, 1988.

T.H. lived with her mother, Patty Wood, and her stepfather, Daryl Wood. On alternate weekends she visited her father, defendant Harold E. Hedrick, who was unmarried and living with his mother, Marianna Houston. The incident in question occurred, according to T.H.'s testimony, on one of these weekends. She said that she and defendant on Friday or Saturday evening had visited in the home of her uncle and his wife, leaving there after midnight. Defendant had then taken her to a motel, ostensibly to see a movie named "Harry and the Hendersons." While there, defendant had allegedly engaged in acts which, according to T.H.'s description of them, would undoubtedly constitute the offenses of which he was convicted. Defendant denied taking T.H. to a motel at any time and denied the acts with which he was charged and to which T.H. had testified.

The evidence which defendant desired to present, by cross-examination of T.H. and by extrinsic evidence, was presented by an offer of proof by defendant upon the pre-trial hearing of the State's motion in limine to exclude the same. The testimony so offered, and excluded by the court, would have shown that Patty and defendant had been divorced when T.H. was an infant. Defendant's mother, Marianna, was T.H.'s custodian until she was two and one-half years old. At that time Patty gained T.H.'s custody upon a motion to modify, subject to defendant's visitation rights. Before filing the motion to modify, Patty had reported to the Division of Family Services her suspicions of T.H.'s sexual abuse by defendant. Her allegation was investigated by the Division of Family Services but DFS was unable to substantiate it.

When T.H. was five years old, she was severely beaten and injured by Patty's then lover, Mark Blaine, who was living with her and T.H. This resulted in juvenile court intervention. The Division of Family Services was ordered to supervise Patty's parenting of T.H. Patty was directed to sever any relationship with Mark Blaine. Patty did not follow this direction, but clandestinely resumed her relationship with Blaine and ultimately bore a child by him.

At the time of the present case, Patty had been married to Daryl Wood for some time and she and Daryl had a child who was born in the summer of 1988 near the time of the defendant's alleged sexual assaults upon T.H.

During all this time defendant continued to exercise his parental rights of visitation with T.H. Most often it was Marianna, defendant's mother and T.H.'s grandmother, who would pick up T.H. at Patty's house for visitation and would return her there. There were many occasions, however, when Patty on one pretext or another would not allow the visitation.

Patty often punished T.H. severely for offenses of varying degrees of gravity, usually lying. She used a wooden cooking spoon as a rod of punishment. More than once this caused visible bruises, one time (in December 1987) severe enough to alarm

Marianna. Marianna took pictures of the bruises and at a later time remonstrated with Patty about the injuries. Sometimes T.H. would be nervous about returning home after visitation, fearing punishment for some infraction, and would ask Marianna to go in with her.

An extraordinary crisis occurred in the Wood household and had scarcely subsided when T.H. for the first time, on August 19, told Patty about defendant's alleged sexual assaults upon her. This disclosure was made during a conversation in which Patty told T.H. about some unspecified deviate sexual practices performed upon her, Patty, by defendant during their marriage. (This conversation was not ruled out by the court, and defendant was allowed to cross-examine T.H. with respect thereto.) The Wood household crisis had come to a head the previous week. Patty had absented herself from home for a couple of days, spending part of the time with a friend and part of the time at a motel. She had then returned home and on Saturday had attempted to commit suicide by ingesting sleeping pills. She was taken to the hospital for a day, then to Western Missouri Mental Health Center for a day, returning home on Monday. After Patty's attempted suicide, Daryl Wood called the Division of Family Services and a social worker visited the home. Patty was absent from home when Marianna picked up T.H. for visitation on Friday evening. T.H. told Marianna that "her mother and Daryl had had a fight, and that their mother had went to a friend's house to stay." Patty was still not home when Marianna returned T.H. on Sunday evening. Marianna returned to the Wood house on Monday evening. By this time Patty was home. Marianna scolded Patty for her neglect of maternal duty and the two women got into a heated quarrel. Marianna ventilated an accumulation of years of Patty's derelictions. The quarrel subsided, however, and the women parted with arrangements for Marianna to pick up T.H. for visitation again on the following Friday, a visitation which Patty cancelled after T.H. told her of defendant's alleged sexual assault in the motel.

■ It was competent for defendant to show the facts relating to the history of the tempestuous relations with T.H.'s mother, her father the defendant, and her grandmother Marianna as they related to T.H., and of T.H.'s relations with each of them, and the trial court was in error in excluding evidence thereof. It is difficult to say precisely how the unstable situation in which she found herself might have led to her fabrication of the sex charge against her father. Judges and lawyers have learned that following the mind of a child is uncertain business, especially a child torn between hostile parents. The child learns mechanisms to avoid hurt to herself. Defendant advances the hypothesis that T.H. loved her mother and feared being removed from her custody, and that she fabricated the sex charge against her father to avoid being removed from her mother's custody—or that the story was concocted by the mother as a weapon against the father, or to divert the Division of Family Services investigation, and her story was adopted by the pliant youngster.

The general principles governing impeachment of a witness to show bias are aptly stated by Wigmore:

> Bias, in common acceptance, covers all varieties of hostility or prejudice against the opponent personally or of favor to the proponent personally.... The kinds of evidence [include] ... the circumstances of the witness' situation, making it "a priori" probable that he has some partiality of emotion for one party's cause.

> . . . .

> The range of external circumstances from which probable bias may be inferred is infinite. Too much refinement in analyzing their probable effect is out of place. Exact concrete rules are almost impossible to formulate, and where possible are usually undesirable. In general, these circumstances should have some clearly apparent force, as tested by experience of human nature, or, as it is usually put, they should not be too remote.

Among the commoner sorts of circumstances are all those involving some intimate family relationship to one of the parties by blood or marriage ... or some such relationship to a person, other than a party, who is involved on one or the other side of the litigation, or is otherwise prejudiced for or against one of the parties.

3A Wigmore, *Evidence* §§ 945, 949 (Chadbourn rev. 1970).

■ These principles have been recognized by Missouri courts. In *State v. Johnson*, 700 S.W.2d 815, 817 (Mo. banc 1985), *cert. denied*, 476 U.S. 1119, 106 S.Ct. 1980, 90 L.Ed.2d 663 (1986), the Missouri Supreme Court articulated the general rule which serves as a guide in this case:

If a witness is hostile, biased, or prejudiced against a party, the substance of his testimony may be affected by his other than impartial state of mind. In such an instance, that party should be afforded an opportunity to display before an uninformed jury the bias, hostility, or prejudices held by the witness against that party. Once informed, the jury can then, with greater accuracy, determine the appropriate weight to be given the whole of the witness' testimony.

■ Furthermore, the facts and circumstances showing bias may be shown specifically, and may be shown either by cross-examination of the witness sought to be impeached or by extrinsic evidence. 3A Wigmore at § 948; *State v. Pigques*, 310 S.W.2d 942, 947 (Mo.1958); *State v. McLachlan*, 283 S.W.2d 487, 489 (Mo.1955); *State v. Day*, 339 Mo. 74, 95 S.W.2d 1183, 1185 (1936). In addition, "the cross-examiner is not limited to the question whether bias exists, but is permitted to explore the reason therefor. Indeed, a witness cannot be asked whether he is biased; he must be asked as to particular facts which may or may not equate to bias." *Wharton's Criminal Evidence* § 436 (13th ed. 1972); *see also* 98 C.J.S. *Witnesses* § 560 (1972).

The State was able to present T.H. as a child of one dimension, unburdened by the accumulated baggage of a traumatized childhood. The jury was ignorant of the milieu in which the child had been reared, ignorant of the family crisis which had scarcely subsided when T.H. disclosed to Patty the alleged sexual offenses by her father, ignorant of the conflicts between Patty and defendant and defendant's mother, ignorant of Patty's eccentricities. The jury's verdict depended altogether upon their evaluation of T.H.'s veracity as against that of defendant, the classic "swearing match." We are persuaded they were entitled to know the facts which were ruled off limits, and defendant was entitled to present them.

Especially in the case of young child witnesses in sex offense cases does an accused need a fairly wide latitude in developing the subtle influences and pressures which may be at work upon the child to produce a fabricated or a distorted account. It is axiomatic that "no charge is more easily made or more difficult to disprove than a sex charge, particularly if made by a young child ..." *State v. Nab*, 245 Or. 454, 421 P.2d 388, 390 (1966). Courts have long been sensitive to the need to ensure that defendants in this class of cases receive a fair trial. In *State v. Horton*, 247 Mo. 657, 153 S.W. 1051, 1053 (1913), the Missouri Supreme Court illustrated the need for wide latitude, stating that in sex offense cases "where the nominal prosecutrix is a mere child, the person having custody or control of such child is the real prosecutor or prosecutrix, and ... charges of this character are sometimes preferred for ulterior purposes." *See also S.P.N. v. M.W.N.*, 708 S.W.2d 767, 768 (Mo.App. 1986). The *Horton* court held reversible error the trial court's refusal to allow defendant to introduce evidence of bias against defendant by the eleven-year-old prosecutrix's mother. The court noted the peril attendant to refusing to allow introduction of bias evidence:

The frequency of verdicts of guilty on charges of rape, incest, carnal knowledge, and seduction, upon evidence not strong enough to secure convictions on other charges, demonstrates the fact that, when a man is charged with an assault upon a woman or child, the

charge itself injects more or less prejudice into the minds of the jury, and such prejudice sometimes attains such force as to compel the defendant to prove himself innocent beyond a reasonable doubt, in order to secure an acquittal.

*Horton,* 153 S.W. at 1053–54.

In *Woods v. State,* 657 P.2d 180 (Okla. Crim.App.1983), the Oklahoma Court of Criminal Appeals reversed defendant's conviction for incest because the trial court improperly limited his cross-examination of the prosecutrix, defendant's fifteen-year-old daughter. At trial defendant sought to prove that his daughter's motive for filing the incest complaint was to punish him for refusing to give his consent for her to marry her 24-year-old fiance, and to retaliate for her father's threats to have her fiance arrested for statutory rape. Defendant attempted to elicit on cross-examination that his daughter had on prior occasions made allegations that she had either been sexually molested or had had intercourse with certain family members, and that each time her accusations had been provoked by, or were in retaliation to, threats to have her fiance arrested. *Id.* at 181. The court in *Woods* held that defendant's proposed area of inquiry was relevant to impeach his daughter's credibility by showing a motive or propensity to lie.

In *State v. Roberts,* 25 Wash.App. 830, 611 P.2d 1297 (1980), the Washington Court of Appeals held that it was reversible error to prevent the defendant from pursuing a theory through cross-examination that the alleged rape victim's testimony was motivated by discipline from her mother. The alleged victim, who was 13 years of age, testified at trial. The court stated:

> Where a case stands or falls on the jury's belief or disbelief of essentially one witness, that witness' credibility or motive must be subject to close scrutiny. Here, the inquiry by the defendant went to the question of whether the witness had been coerced to testify in a particular way. In the prosecution of sex crimes, the right of cross-examination often determines the outcome. In such cases, the credibility of the accuser is of great importance, essential to prosecution and defense alike.

*Id.* at 1300–01 (citations omitted).

In *State v. Helms,* 322 N.C. 315, 367 S.E.2d 644 (1988), a sexual molestation case, the North Carolina Supreme Court held reversible error the trial court's exclusion of evidence that defendant, the alleged victims' stepmother, shortly before she was accused of committing the sexual offenses had consulted a lawyer to initiate a custody action against the natural mother. The *Helms* court stated that:

> The defense in this case was premised largely on the theory that [the natural mother] caused her sons to make up false charges against defendant. Such a theory, divorced from evidence that defendant and Richard Helms were planning to institute a custody action against [the natural mother], is not nearly so plausible as it would be in the presence of such evidence. This case boils down to which witnesses the jury chooses to believe.

*Id.* at 647.

■ The danger that the trial will become bogged down in collateral issues and the jury distracted and confused does not outweigh defendant's interest in showing the accusing witness's bias. The bias of an accusing witness is never a "collateral" matter but is directly and intimately involved in the issues of the case. *State v. Johnson,* 700 S.W.2d 815, 817 (Mo. banc 1985), *cert. denied,* 476 U.S. 1119 (1986); *Vosevich v. Doro, Ltd.,* 536 S.W.2d 752, 760 (Mo.App.1976); *Thornton v. Vonallmon,* 456 S.W.2d 795, 798 (Mo.App.1970); *State v. Day,* 339 Mo. 74, 95 S.W.2d 1183, 1185 (1936). The trial judge's powers to control the incidents of a trial are adequate to prevent the trial going so far afield that the central issue is lost from view. It has been noted that the trial court has responsibility "for seeing that the sideshow does not take over the circus." E. Cleary, *McCormick on Evidence* § 40 (3d ed.1984).

■ Our holding here does not impinge upon the necessary rule that the extent of cross-examination is subject to the trial court's discretionary control. *State v.*

*Conley,* 699 S.W.2d 50, 51 (Mo.App.1985); *State v. Rose,* 339 Mo. 317, 96 S.W.2d 498, 504 (1936). It is one thing, though, to call a halt to over-extended, irrelevant or repetitive cross-examination—which is within the trial court's discretion—and quite another to rule off limits an entire area of inquiry which has a bearing upon the witness's veracity. "The trial court may properly limit the scope and extent of cross-examination into the witness' bias or prejudice ... but is not within the trial court's discretion to prevent it entirely." *Vonallmon,* 456 S.W.2d at 798; *see also State v. Pigques,* 310 S.W.2d 942, 950 (Mo.1958). It is our conclusion that the trial court erred in excluding the evidence offered by defendant, and that the case for that reason must be reversed and remanded for a new trial.

It is not necessary for us to rule upon defendant's claim that the court erred in allowing the mid-trial amendment to the information changing the date of the incident with which defendant was charged. Defendant's criticism of the amendment is only that the amendment was unseasonable, i.e., that the amendment was after defendant had prepared a defense against a charge of an offense occurring on a certain weekend, and that the allowing of the amendment during trial gave him no opportunity to meet the new date. In another trial, defendant will have ample opportunity to meet the charge made by the amended information.

Judgment reversed and cause remanded for new trial.

All concur.