259 S.W.3d 39 (2008)
STATE of Missouri, Respondent,
v.
J.L.S.,[1] Appellant.
No. WD 67933.
Missouri Court of Appeals, Western District.
April 8, 2008.
Motion for Rehearing and/or Transfer to Supreme Court Denied May 27, 2008.
Application for Transfer Denied August 26, 2008.
*41 James Wyrsch, Kansas City, for appellant.
Shaun Mackelprang, Jefferson City, for respondent.
Before HOLLIGER, P.J., LOWENSTEIN and NEWTON, JJ.
HAROLD L. LOWENSTEIN, Judge.

INTRODUCTION
This is a direct appeal from the conviction of J.L.S., (Defendant) for one count of statutory sodomy in the second degree. The pivotal issue in this case is whether, for the purpose of cross-examining the prosecutrix in a sex offense trial, a defendant may introduce evidence that the prosecutrix and a non-testifying relative of hers made unsubstantiated allegations that the defendant had violated the terms of his pre-trial release. After a jury trial, Defendant was sentenced to four years imprisonment. The execution of the sentence was suspended and Defendant received five years of supervised probation and thirty days shock-detention instead. He was also ordered to comply with the special conditions in chapter 589, RSMo applicable to convicted sex offenders. Defendant now appeals his conviction, asserting evidentiary errors and questioning the constitutionality of the special statutory requirements imposed on convicted sex offenders.

FACTUAL BACKGROUND
In 2003, at the beginning of her eighth-grade year, Victim began living with her Aunt and Uncle because her parents moved frequently and she desired to complete high school in one location. Victim is related to Aunt in that her mother and Aunt are siblings. Defendant is the brother of Uncle. Victim was familiar with Defendant through regular family events and gatherings. On July 21st, 2004, Victim, Aunt, Uncle, Defendant, and several other relatives and friends were camping at the Northeast Missouri state fairgrounds. It was the custom of the families (both Aunt and Uncle and Defendant and his spouse) to camp at the fairgrounds in camping trailers during the fair. Defendant was a member of the fairgrounds board and was responsible for certain *42 duties with respect to the state fair and the camping areas.
On the night of the 21st, Victim and her Friend (Victim and her female Friend were both fifteen years of age at the time of these events) attended a concert on the fairgrounds. Afterwards, Defendant picked up the girls on what they referred to as a "gator," and what was described at trial as a vehicle similar to a golf cart, but having two side-by-side seats in the front and a small pickup-truck type bed in the back. Defendant drove the girls back to the campsite, where Victim and Friend entered the trailers in which they were staying and changed into shorts. All three re-boarded the vehicle, with Defendant driving and the girls seated facing each other in the truck-bed area (behind Defendant as he drove). The testimony of the three primary witnesses, while fairly in agreement as to the facts stated so far, diverges at this point. According to Victim's testimony, a few stops were made to transfer alcoholic beverages from one camping trailer to another and to load a small cooler on the gator with some of the drinks. Afterwards, the three continued on a trek around the campgrounds, visiting various other trailers along the way. Victim claims that the girls consumed some of the alcohol from the cooler and that Defendant made a special stop by a dumpster in order to allow the girls to dispose of empty bottles. After this stop, Defendant pulled into an unlighted parking lot and parked the gator. He exited the driver's seat and approached Friend, whispering something in her ear. He then walked around to where Victim was seated and whispered to her, instructing her to get on her knees. Victim did not comply. Defendant walked away from the gator to relieve himself. As he returned, he exposed himself to the girls and asked them if they had ever "seen something this big." When he reached the back of the gator, he leaned over toward Friend and attempted to put his hand in her shorts. However, Friend began to vomit (due to alcohol consumed before and during the gator ride), and Defendant turned to Victim. Defendant reached into Victim's shorts, moved her undergarment aside, and touched her vagina. Victim told Defendant to stop and pushed his hand away from her body. Defendant then returned to the driver's seat of the gator, took a phone call, and drove the girls back to the campsite.
Victim testified that she and Friend cried on the return trip and that they cried and discussed the event upon returning to the trailer in which Friend was camping. However, Victim did not report the event to Aunt or Uncle. In fact, she interacted with Defendant for the rest of the camping trip as if nothing had occurred between them. She explained at trial that reporting the incident would have caused a "family feud" between Uncle and Defendant and that she did not want to cause such a disturbance. Victim kept the July 2004 incident secret until fall of that year when she confided in Aunt and a friend from school. She made them both promise not to inform anyone else. It was not until February of 2005, when the Division of Children's Services, acting on an anonymous hotline tip, contacted her with respect to the incident that Victim gave a statement to authorities.
Friend also testified at trial. Notably, at the time of the proceedings, Friend's father was employed by Defendant. Also, Defendant was related to Friend's step-mother. Friend testified to having accompanied Defendant and Victim on a trip in the gator but claimed not to remember several of the stops that Victim mentioned, in particular the stop in the darkened parking lot. According to Friend, the three stopped to relieve themselves and dispose of empty bottles, but this did not *43 occur in a parking area. She denies that Defendant exposed himself to the girls or made any attempt to touch them inappropriately. Friend admits that there was a brief moment when she looked away while the three were in the parked gator but claims that she saw nothing improper occur. Friend's testimony is that she was sick from alcohol at that time and that Defendant helped the girls onto the gator after the stop. She recalls the subsequent conversation at the camping trailer with Victim but insists that she knew nothing of the touching until that point and did not believe Victim's story when she heard it.
Defendant testified that he and Uncle had difficulty getting along and that personal and business relationships between the families had been strained for several years. He stated that, in February of 2005, right before the investigation was started by the Division of Children's Services, the two families were involved in a business dispute. As to the night in question, the two girls had asked him if they could ride along while he made rounds to check buildings and campsites as part of his board-member duties. He claimed at trial that he could not have driven the gator into the parking area where Victim alleged the improper touching occurred because a locked gate blocked that area from motorized traffic after a certain time in the evening. His explanation is that he made a stop at a barn where cows and sheep were held and, when he returned from inspecting it, the girls were standing next to the gator and appeared to be somewhat intoxicated. It was for this reason that he helped them onto the back of the machine. Defendant further testified that he did not expose himself to the girls and that they could not have seen him while he relieved himself. On cross, Defendant admitted that there were portable toilets in the area that he could easily have accessed, but he chose to relieve himself outside.
Before trial, the court sustained the prosecution's motion to exclude evidence regarding two police reports that Defendant planned to use to discredit Victim's testimony. The reports were made by Victim and Uncle after Defendant was charged and released on bond, but before the beginning of the trial. One of the conditions of Defendant's release on bond prohibited his presence at the state fairgrounds. In the summer of 2005, Victim reported to police that Defendant had been present at the fairgrounds. In 2006, Uncle made a similar report. Defense counsel sought to introduce the written police reports and the testimony of the officers that investigated them. According to the offer of proof, the officers would have testified that they conducted investigations based on the reports and that they were unable to substantiate the claims of Victim or Uncle as to Defendant's presence at the fairgrounds.
The jury apparently found Victim's account to be the most credible of the three because it convicted Defendant of second-degree statutory sodomy. Defendant raises three points on appeal: (1) that the trial court erred by failing to acquit on the ground that Victim's testimony contained such internal inconsistencies as to require corroborating evidence for a conviction, (2) that the court erred in excluding evidence of arguably false police reports filed by Victim and Uncle, which would have shown Victim's bias, and (3) that certain provisions of chapters 566 and 589 constitute cruel and unusual punishment as applied to Defendant and amount to a bill of attainder.[2] As this court reverses *44 based on Defendant's second point, discussion of points one and three is unnecessary.

STANDARD OF REVIEW
The scope of the evidence used to show that a witness is biased lies within the broad discretion of the trial court. State v. Johnson, 700 S.W.2d 815, 817-18 (Mo. banc 1985). The trial court may properly limit the scope and extent of an examination of a witness's bias or prejudice, but it is not within the court's discretion to completely preclude "an entire area of inquiry which has a bearing upon the witness's veracity." State v. Hedrick, 797 S.W.2d 823, 828 (Mo.App.1990).

DISCUSSION
In Missouri, "`the interest or bias of a witness and his relation to or feeling toward a party are never irrelevant.'" Johnson, 700 S.W.2d at 817 (quoting State v. Edwards, 637 S.W.2d 27, 29 (Mo.1982)). The court in Johnson explained:
If a witness is hostile, biased, or prejudiced against a party, the substance of his testimony may be affected by his other than impartial state of mind. In such an instance, that party should be afforded an opportunity to display before an uninformed jury the bias, hostility, or prejudices held by the witness against that party. Once informed, the jury can then, with greater accuracy, determine the appropriate weight to be given the whole of the witness'[s] testimony.
Id. (Citation omitted). The term "bias" includes "`all varieties of hostility or prejudice against the opponent personally or of favor to the proponent personally.'" Hedrick, 797 S.W.2d at 825 (quoting 3A Wigmore, Evidence §§ 945, 949 (Chadbourn rev.1970)). Evidence showing bias includes circumstances of the witness's situation that make it probable that he or she has "`partiality of emotion for one party's cause.'" Id. (quoting 3A Wigmore, Evidence §§ 945, 949). Such circumstances should have a "`clearly apparent force'" on the witness "`as tested by [the] experience of human nature.'" Id. (quoting 3A Wigmore, Evidence §§ 945, 949). Common examples include "`those involving some intimate family relationship to one of the parties by blood or marriage ... or some such relationship to a person, other than a party, who is involved on one or the other side of the litigation, or is otherwise prejudiced for or against one of the parties.'" Id. at 826. (quoting 3A Wigmore, Evidence §§ 945, 949).
*45 Facts and circumstances that display bias "may be shown either by cross-examination of the witness sought to be impeached or by extrinsic evidence." State v. Foster, 854 S.W.2d 1, 4 (Mo.App. 1993). Parties are not confined to answers elicited on cross-examination and may prove a witness's bias, prejudice, or hostility through the use of extrinsic evidence. State v. Solven, 371 S.W.2d 328, 330 (Mo. banc 1963). Bias held by an accusing witness is never a collateral matter but is "directly and intimately involved" in the issues of the case. Hedrick, 797 S.W.2d at 827. The danger that the trial will become bogged down in collateral issues that distract and confuse the jury is outweighed by the defendant's interest in showing the accusing witness's bias. Id.
Like other witnesses, the complaining witness in a sex offense case may be impeached by evidence that her general reputation for truth and veracity is bad but not ordinarily by proof of specific acts of misconduct. Foster, 854 S.W.2d at 4. "[I]mpeaching testimony should be confined to the real and ultimate object of the inquiry, which is the reputation of the witness for truth and veracity." State v. Wolfe, 13 S.W.3d 248, 258 (Mo. banc 2000). However, "when a specific act of misconduct is relevant to show a witness's bias, it has probative value." Kuehne v. State, 107 S.W.3d 285, 294 (Mo.App.2003). In those cases, "the general ban on impeachment of witnesses through proof of prior (unconvicted) misconduct has three exceptions: where the inquiry shows (1) a specific interest; (2) a possible motivation to testify favorably for the State; or (3) an expectation of leniency." Wolfe, 13 S.W.3d at 258. "The `specific interest' exception applies to evidence that `demonstrate[s] a specific bias against [the] defendant.'" Kuehne, 107 S.W.3d at 294.
It has long been recognized that defendants in rape or sexual assault cases should be allowed to introduce evidence that the prosecuting witness's story is a fabrication. See State v. Horton, 247 Mo. 657, 153 S.W. 1051 (1913). In Horton, the Supreme Court stated, "[D]efendant may introduce any competent evidence, direct or circumstantial, to show that the charge against him was concocted by the prosecutrix or others." Id. at 1054. The Court continued, "Facts or circumstances which tend to show the motive or bias of any witness who has testified, or the motive of the prosecutrix in making the charge, or to affect her credibility, are admissible; but such evidence is generally confined to bias or motive of one who has testified as a witness." Id. The Horton Court found error in the trial court's exclusion of evidence that the mother of the eleven-year-old victim had made threats of personal violence against the defendant.[3]Id. at 1052-54.
Since Horton, several Missouri cases have recognized the propriety of admitting extrinsic evidence of prior acts showing fabrication and bias in rape and sexual assault trials. See State v. Hedrick, 797 S.W.2d at 825-26 (trial court erred in excluding evidence that the child-victim's *46 mother had made prior false allegations relating to the defendant's interactions with the victim and evidence of an extremely strained relationship between the victim's mother and defendant that involved a custody dispute); State v. Lampley, 859 S.W.2d 909, 911 (Mo.App.1993) (evidence of prior molestation charge and subsequent removal of offender from victim's home was improperly excluded in that it could show that victim was using current molestation charges to remove defendant from family home); Kuehne, 107 S.W.3d at 295 (evidence that victim's mother had repeatedly badgered both victim and defendant about whether inappropriate touching had occurred and that she had accused her ex-husband of molesting victim was admissible to show bias).[4] In State v. Hedrick, this court examined a case in which charges were brought against a father for sexually abusing his ten-year-old daughter. Hedrick, 797 S.W.2d at 824. At trial, the defendant-father sought to introduce evidence that he and victim's mother had been divorced for some time, that there was a long history of conflict between the two of them, and that, during a heated custody dispute, mother had reported to the Division of Family Services (DFS) that her daughter had been sexually abused by the defendant. Id. This allegation was investigated by DFS, but was unsubstantiated. Id. It was the defendant's theory that, due to recent problems with DFS, victim feared being removed from her mother's custody and that either victim or mother fabricated the sexual abuse story to prevent a modification of custody to father. Id. at 825. The evidence, however, was excluded by the trial court. Id. at 824. This court reversed and remanded for a new trial, stating that it was "persuaded [that the jury was] entitled to know the facts which were ruled off limits, and defendant was entitled to present them." Id. at 826, 828. This court noted that "[e]specially in the case of young child witnesses in sex offense cases does an accused need a fairly wide latitude in developing the subtle influences and pressures which may be at work upon the child to produce a fabricated or a distorted account." Id. at 826.
One of the defense theories in the instant case was that Victim had fabricated her account of Defendant's behavior because of her loyalty to Uncle and Aunt and their animus toward Defendant. To this end, defense counsel was allowed to elicit testimony of ill-will between the two families. *47 It was disclosed through trial testimony that a business dispute had arisen and heightened the animosity shortly before the hotline report was made to the Division of Children's Services. Plainly, Defendant sought to develop through this evidence his theory that Victim was biased by her close relationship to Uncle and Aunt and that such bias established a motive for the fabrication of charges and testimony.
Defendant argues that evidence of the unsubstantiated reports would have bolstered his fabrication theory and shed light on the extent of the animosity between the families. The State counters that evidence that investigators were unable to substantiate a report does not amount to evidence of a false report. In so arguing, the State ignores this court's decision in Hedrick that it was error to exclude evidence of unsubstantiated reports as proof of bias. While an admission of falsity by the accuser or other certain proof of deceit in the making of the reports at issue would certainly be more probative of bias, the question of whether the unsubstantiated reports here constituted sufficient evidence of bias to undermine Victim's account was one for the jury.
The State also argues that the reports were inadmissible because they did not occur prior to the primary accusation. Although no Missouri case appears to address this exact issue, a Massachusetts case provides discussion on the topic that this court finds persuasive. See Commonwealth v. Nichols, 37 Mass.App.Ct. 332, 639 N.E.2d 1088 (1994). In Nichols, the court of appeals dealt with a case where a girl (age eleven when the alleged abuse began) alleged various acts of sexual abuse by her step-father. Id. at 1089. At trial, the defendant sought to question the prosecutrix with respect to allegations of molestation she made against another family member after the acts for which the defendant stood trial supposedly occurred and after she had made allegations against the defendant. Id. at 1090. It appears that the prosecutrix in Nichols had disagreed sharply with the strict parenting style of her mother and step-father. Id. at 1089. After a heated argument, she promised to "get even" and subsequently brought the litigated charges. Id. As a result of her report to the department of social services (DSS), she was removed from the defendant's home and placed with her aunt and uncle. Id. When she became unhappy with that living situation, she reported to DSS that her uncle had molested her. Id. Upon being placed in a foster home, she recanted the allegations against her uncle. Id. at 1090. The trial court excluded evidence of the admittedly false subsequent allegations primarily because they occurred after the charges before the court. Id. The appellate court reversed, explaining:
We do not think sequence is critical. It is surely important that the collateral allegation be proximate in time to the primary accusation against the defendant, but the collateral allegation has no less bearing on the credibility of the accusing witness if made after the primary allegation. Indeed, a lie subsequent to the primary event, if closer in time, may be more probative of a proclivity to lie and fabricate than a prior false allegation.[5]
Id. (citations omitted, emphasis added). The court reasoned that the excluded evidence *48 would have been exceptionally probative and important, especially since the case boiled down to a credibility match between the prosecutrix and the defendant. Id. at 1090-91.
Similarly, the Illinois Court of Appeals, in People v. Nicholl, found that the trial court in that case abused its discretion by excluding evidence of a subsequent false accusation by the victim of an alleged sexual molestation. See 210 Ill.App.3d 1001, 155 Ill.Dec. 423, 569 N.E.2d 604 (1991). Noting that the case involved a subsequent rather than a prior false allegation of sexual abuse, the court stated that it was "unaware of any reason why this fact should automatically render the subsequent allegation inadmissible." Id. at 611. It continued, "If a false accusation bears on a person's credibility, we can discern no reason why the timing should matter. A lie is a lie." Id.
Clearly, other jurisdictions analyzing the issue have found that the status of a potentially false accusation as "prior" or "subsequent" to the primary accusation at trial is not dispositive as to admissibility. This court agrees with that reasoning. The police reports at issue here were filed in the summers of 2005 and 2006. Victim first made allegations (to the Division of Children's Services) against Defendant in February of 2005, and the trial took place in October of 2006. The reports were close in time to both the initial allegations and to her testimony at trial and involved potentially false accusations made against Defendant. Under the circumstances of this case, evidence of the reports and their potential falsity should have been admitted to show bias and fabrication.
Finally, it should be noted that the basis for admission of Victim's subsequent accusation and Uncle's is somewhat different. Uncle did not testify at trial and, therefore, admissibility of evidence relating to his 2006 report cannot be justified as impeachment of a witness through evidence of a false accusation by that witness. The question regarding the 2006 report is whether evidence of another's false accusation is admissible as proof of the complaining witness's bias. Such an accusation would not be admissible to erode the general credibility of the complaining witness because the false statement of another would not tend to prove the complaining witness's lack of veracity. See supra note 2; Williams v. State, 168 S.W.3d 433, 440-41 (Mo. banc 2005). However, in the situation at bar, the evidence coincides with the Defendant's theory of fabrication. Where the theory at trial was that Victim's family environment either fostered the motive for or directly encouraged a fabrication of testimony against Defendant, it was certainly important for the jury to consider evidence that Uncle, one of the key actors in producing such an environment, may have himself made false charges against Defendant. Uncle's unsubstantiated subsequent accusation was evidence probative of the source and extent of Victim's bias.
This court finds error in the trial court's blanket exclusion of evidence relating to the police reports made by Victim and Uncle subsequent but proximate in time to the charges brought against Defendant. On this basis, which is strictly limited to the facts of this case, the judgment and conviction are reversed and the case is remanded for a new trial.
All concur.
NOTES
[1] Pursuant to § 566.226.1, RSMo 2007, the Appellant's initials are being used.
[2] Defendant's challenge to the constitutionality of state statutes raises the issue of this court's jurisdiction. See Sharp v. Curators of Univ. of Mo., 138 S.W.3d 735, 737 (Mo.App. 2003). Cases involving the validity of a state statute are within the exclusive jurisdiction of the Supreme Court of Missouri. Id; Mo. Const. art. V, § 3. However, if the claim is merely colorable, as opposed to a "real and substantial" challenge, the court of appeals does not lose jurisdiction. Sharp, 138 S.W.3d at 738. Claims that are plainly without merit may be deemed "colorable" and addressed by this court. Id. Defendant's argument in his third point is that the special regulatory provisions enacted in Missouri to ensure registration of sex offenders and prevent their contact with children are invalid as cruel and unusual punishment that amounts to a bill of attainder. By definition, in order to constitute a bill of attainder or cruel and unusual punishment, an action or restriction must first constitute punishment. See State ex rel. Bunker Res. Recycling & Reclamation, Inc. v. Mehan, 782 S.W.2d 381, 385 (Mo. banc 1990); Cooper v. Gammon, 943 S.W.2d 699, 702-03 (Mo. App.1997). It has already been decided that the registration of sex offenders is a non-punitive regulatory measure intended for the protection of children. R.W. v. Sanders, 168 S.W.3d 65, 68-70 (Mo. banc 2005). Taking that decision into account, Defendant's third point is plainly without merit.
[3] The Court noted that, in cases involving young victims "the person having custody or control of such child is the real prosecutor or prosecutrix, and that charges of this character are sometimes [brought] for ulterior purposes." Horton, 153 S.W. at 1053. Notably, it did not decide whether evidence of the mother's bias could be admitted on the ground that she was the force behind the accusations because the mother had testified in the case and "[t]he defendant had the legal right to bring to the attention of the jury any fact which would show malice or ill will against him on the part of any witness who testified on behalf of the [S]tate for the purpose of affecting the credibility of such witness and the weight to be given to his or her testimony." Id.
[4] Courts have applied two separate theories in allowing extrinsic evidence of prior false accusations for impeachment purposes. One such theory is that, in certain circumstances, evidence of prior accusations is indicative of bias and a motive to fabricate the current charge. See State v. Hedrick; State v. Lampley; Kuehne v. State. Another theory under which prior accusations may be admitted is that prior false accusations reflect poorly on the witness's general veracity with respect to charges before the court. See State v. Long, 140 S.W.3d 27 (Mo. banc 2004) (error found in exclusion of evidence that victim had repeatedly and falsely accused a man other than the defendant of sexual and physical assault). "`The distinction between impeachment evidence proving bias and impeachment of general credibility is important because generally applicable evidentiary rules limit inquiry into specific instances of conduct through the use of extrinsic evidence and through cross-examination with respect to general credibility attacks, but no such limit applies to credibility attacks based on motive or bias.'" State v. Raines, 118 S.W.3d 205, 213 (Mo.App.2003). (quoting United States v. Hill, 322 F.3d 301, 304 (4th Cir.2003)). Indeed, the general veracity theory appears to apply only where the witness herself has made prior false accusations and not where the accusations were made by another, however closely related that person may have been to the witness. See Williams v. State, 168 S.W.3d 433, 440-41 (Mo. banc 2005) (discussing the implications of State v. Long); State v. Long, 140 S.W.3d 27, 30-32 (Mo. banc 2004).
[5] Although the Massachusetts court analyzed the evidence of subsequent false allegations as it affected the general credibility of the witness, it noted that an alternative ground for allowing such evidence would be its tendency to prove bias on the part of the witness. See Nichols, 639 N.E.2d at 1091-92.