

# Missouri Court of Appeals

## Southern District

### Division One

STATE OF MISSOURI, )
)
    Plaintiff-Respondent, )
)
v. ) No. SD35331
)
KARL DAVID LAWRENCE, ) **Filed: Jan. 15, 2019**
)
    Defendant-Appellant. )

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Calvin R. Holden

**<u>AFFIRMED</u>**

Karl David Lawrence ("Defendant") appeals his conviction, following a jury trial, on two counts of statutory sodomy in the first degree.[1] In two points relied on, Defendant claims the trial court erred in excluding testimony supporting an alibi defense and excluding evidence of a child custody dispute to which Defendant was not a party. Finding no merit in these claims, we affirm.

---

[1] *See* section 566.062. Unless otherwise noted, all statutory references are to RSMo Cum. Supp. 2006. In this opinion, we use titles or first names in an attempt to carry out the directive in section 595.226, RSMo Cum. Supp. 2009, to protect the identities of victims of crimes contained in chapter 566. No disrespect or familiarity is intended.

1

**The Evidence**

We summarize here the evidence relevant to Defendant's points in the light most favorable to conviction.[2] *See State v. Sanders-Ford*, 527 S.W.3d 223, 225 n.1 (Mo. App. S.D. 2017). Victim was born in 1999. Her parents, Mother and Father, separated in 2005 when Victim was five. After the separation, Victim and her two younger sisters, C. and R., lived with Mother in Arnold, and they spent time with Father in Springfield on every other weekend, rotating holidays, and longer periods of time during the summer.

When Victim was 7 or 8 years old, Father married a woman named Carla, and they began living in Republic. Carla is Defendant's sister. After Father married Carla, Victim and her sisters frequently went to the home of Carla's parents, Jack and Connie, in Aurora. Defendant lived fairly close to his parents, and he would often be in their home when Victim and her sisters were there.

In January 2014, Victim told Mother that Defendant started sexually abusing her when she was 11 or 12, and it continued until she was 14. At trial, Victim testified about a trip the entire family took to Florida in a rented van in 2012 ("the 2012 Florida trip"). The family members in the van included Father, Carla, Jack, Connie, Defendant, Victim, C., R., and Victim's half-sister. Defendant touched Victim's vagina through the bottom of her shorts on the way to Florida while they were riding in the back of the van. When they arrived in Florida, Defendant came into Victim's bedroom at the condo where she was unpacking her clothes and began rubbing and inserting his finger into her vagina. The trip was cut short when a relative passed away, and everyone immediately packed their things and returned to Missouri.

---

[2] Evidence unfavorable to the verdicts is cited only to provide context for Defendant's claims on appeal.

Victim testified that upon returning to Missouri, everyone in the van went to Father's house in Republic. Father, Carla, Jack, Connie, and Victim's half-sister left to return the rental van, while Victim, Defendant, C., and R. stayed at Father's house in Republic. When Victim went to the garage to check on sand dollars they were bleaching, Defendant followed. While in the garage, he put his hands down her pants, rubbing and inserting his fingers into her vagina. Defendant later followed her to the bedroom and did the same thing. Victim was 13 years old at the time.

Defendant was charged with two counts of statutory sodomy based upon the two incidents that occurred immediately after the family returned from the 2012 Florida trip. Both counts charged that

> [B]etween June 1, 2012 and July 31, 2012, in the County of Greene, State of Missouri, [Defendant] for the purpose of arousing or gratifying the sexual desire of any person, had deviate sexual intercourse with [Victim], who was then less than fourteen years old, by touching her genitals with his hand.

In his response to a discovery request from the State, Defendant indicated that he might call as witnesses Jack and/or Connie, Father and/or Carla, and three others. At no point prior to trial did Defendant indicate his intent to rely on an alibi defense.

During the second day of trial – the first day that Defendant presented evidence – Carla and Father both testified that the van and everyone in it returned home from the 2012 Florida trip to Aurora, not to Republic as Victim had testified. Carla and Father testified that Defendant then went immediately to the funeral home with Carla, Jack, and Connie; he did not stay at Jack and Connie's house in Aurora.

Before testimony began on the third day of trial, the State made an oral motion to exclude portions of any witness's testimony, including Defendant, regarding the defense

3

of alibi. The State argued that Defendant presented alibi testimony when Carla and Father testified that Defendant could not have committed the abuse described by Victim because he was at the funeral home, not at the house in Republic. The State argued that such relief was appropriate because Defendant had violated the discovery rules by not disclosing to the State his intent to rely on an alibi defense.

After hearing extensive argument on the motion, the trial court noted that "the damage is already out there. [Connie]'s just another third witness to say, 'Okay. I was there. He didn't stay.'" The trial court then granted the State's request and ruled that Defendant's witnesses could not testify in support of an alibi defense. After hearing Defendant's offer of proof on what his alibi testimony would have been, the trial court allowed Defendant to tell the jury that he was not at Father's house in Republic before or after the 2012 Florida trip, but he would not be allowed to specifically state that he went to the funeral home instead.

**Analysis**

*Point 1 – Exclusion of Alibi Testimony*

Point 1 claims the trial court erred in "excluding testimony regarding the return trip from Florida to Aurora" because Defendant did not violate Rule 25.05(a)(5), and, even if he did, the exclusion of such testimony made his trial fundamentally unfair in that other adequate remedies were available. Specifically, Defendant claims it was fundamentally unfair because "the jury heard three State witnesses testify that everyone went to Republic where [Victim] said the abuse occurred but the jury was only permitted to hear from two Defense witnesses that everyone went to Aurora."

4

"Discovery rules help eliminate surprise and allow both sides to become aware of trial witnesses and evidence." *State v. Vickers*, No. WD 80148, 2018 WL 3622067, at *8 (Mo. App. W.D. July 31, 2018), *as modified* (Aug. 28, 2018), (internal quotation omitted). "When a party fails to comply with a discovery rule, the trial court may order disclosure of material and information, grant a continuance, exclude evidence or enter such orders it deems just given the situation." *State v. Miller*, 935 S.W.2d 618, 623 (Mo. App. W.D. 1996) (quoting *State v. Massey*, 867 S.W.2d 266, 268 (Mo. App. E.D. 1993)). Discovery sanctions are within the discretion of the trial court, and we will reverse only if the sanction results in fundamental unfairness to the defendant. *Id.*

> "The remedy of disallowing an alibi witness to the defendant is almost as drastic, if not as drastic, as declaring a mistrial. The remedy of disallowing the relevant and material testimony of a defense witness essentially deprives the defendant of his right to call witnesses in his defense. This is not to say it should never be done, but it is certainly a drastic remedy that should be used with the utmost of caution.

*State v. Mansfield*, 637 S.W.2d 699, 703 (Mo. banc 1982), abrogated on other grounds by *State v. Clark*, 652 S.W.2d 123, 127 n.4 (Mo. banc 1983). "As a matter of law, no abuse of discretion exists when the court refuses to allow the late endorsement of a defense witness whose testimony would have been cumulative [or] collateral, or if the late endorsement would have unfairly surprised the State." *State v. Hopper*, 315 S.W.3d 361, 367 (Mo. App. S.D. 2010) (quoting *State v. Destefano*, 211 S.W.3d 173, 181 (Mo. App. S.D. 2007)).

Defendant first argues that he was not under a duty to disclose the excluded

testimony because it was not alibi testimony. We disagree. Rule 25.05(a)(5)[3] provides as follows:

> If defendant intends to rely on the defense of alibi and the state in its request specifies the place, date, and time of the crime charged, disclosure shall be in the form of a written statement by counsel for defendant, announcing defendant's intent and giving specific information as to the place at which defendant claims to have been at the time of the alleged offense, and as particularly as is known, the names and addresses of the witnesses by whom defendant proposes to establish the alibi.

The trial court correctly found that Defendant's assertion that he could not have committed the crimes because he was at the funeral home was a specific statement of his specific location at the specific time of the crime. *State v. Anderson*, 18 S.W.3d 11, 16 (Mo. App. W.D. 2000).

His primary argument having failed, we turn to Defendant's alternative claim that, even if the excluded testimony constituted an alibi, his obligation to disclose it was not triggered because the State's Information was not sufficiently specific as to the place, date, and time of the crime charged. Defendant did not make this argument to the trial court until after the State moved to exclude his alibi testimony. If the charging document lacked sufficient detail to enable Defendant to prepare his defense, he was obligated to file a bill of particulars and state with specificity the information he needed to prepare a defense. *State v. Ayansu*, 558 S.W.3d 135, 144 (Mo. App. E.D. 2018) (quoting *State v. Musil*, 935 S.W.2d 379, 382 (Mo. App. S.D. 1996) ("Failure to file a motion for a bill of particulars constitutes a waiver of the right to later complain about a lack of detail in an information")).

---

[3] Unless otherwise noted, all rule references are to Missouri Court Rules (2018). The Supreme Court of Missouri amended the Rule by order dated December 19, 2017, but that amendment did not change the substance of the relevant portion of Rule 25.05.

6

Having failed to timely call this alleged deficiency to the trial court's attention, Defendant "cannot now be permitted to criticize the court's action on that basis." *Anderson*, 18 S.W.3d at 15. Additionally, the record supports the State's contention that the parties knew by April 2017 -- six months prior to trial -- that the charged conduct took place immediately after the 2012 Florida trip. Defendant was under a continuing duty to supplement his discovery responses and furnish his alibi information to the State "as soon as practicable." Rule 25.08. Defendant did not do so.

"In determining whether the trial court abused its discretion, an appellate court must first consider what prejudice the State would have suffered as a result of the discovery violation and second, whether the remedy resulted in fundamental unfairness to the defendant." *State v. Martin*, 103 S.W.3d 255, 260 (Mo. App. W.D. 2003). In this case, the State had already rested its case when Defendant introduced his alibi evidence. Had the defense disclosed prior to trial that Defendant could not have committed the abuse because he was at the funeral home when it allegedly occurred, the State would have had the opportunity to interview witnesses at the funeral home to attempt to confirm or deny Defendant's presence there. *See id.* at 261 (no abuse of discretion in excluding testimony from witness whom the defense failed to endorse, because the State had been precluded from investigating her claim that someone other than defendant was driving).

Defendant argued that he did not give notice of an alibi defense "[b]ecause until [Victim] testified, I wasn't sure if that's what she was going to say[.] . . . [W]e thought she could be claiming it in 2013." The record, however, makes clear that Defendant knew approximately six months prior to trial that the State's evidence would be that the charged abuse occurred immediately after the 2012 Florida trip, which coincided with the

7

bleaching of sand dollars and the death of a relative. More than five months before trial, Defendant provided notice to the State that he might introduce at trial the deceased relative's death certificate, which made it possible for both parties to more exactly determine the time period in which the charged events were alleged to have taken place. Defendant also conceded that he had prepared his witnesses to testify to the alibi in the days prior to the start of trial.

"The second inquiry, and ultimately the standard by which the exclusion of a witness must be tested, is whether the sanction resulted in fundamental unfairness to the defendant." *Martin*, 103 S.W.3d at 261. An appellate court finds fundamental unfairness when the exclusion of the testimony substantively alters the outcome of the trial. *Id.* "To determine whether the exclusion resulted in prejudice to the defendant, the facts and circumstances of the particular case must be examined including the nature of the charge, the evidence presented, and the role the excluded evidence would have played in the defense's theory." *Id.* We also consider whether there is a reasonable explanation for the failure to disclose. *Id.*

*Anderson* supports the trial court's ruling in this case. The issue in that case was whether a defendant must give notice of his alibi defense under Rule 25.05 when the defendant is the only witness who will testify to the alibi. 18 S.W.3d at 14. The Western District stated that there was such a duty, and because the defendant had failed to give prior notice of his intent to rely on an alibi, he was precluded from offering affirmative evidence of his location at the time of the crime. *Id.* The defendant was, however, allowed to "testify regarding his alleged participation in the crime." *Id.* He did so by testifying that he was not at the scene of the crime and, when questioned by the police

8

about it, "he had to 'think hard' about what they were talking about because he 'knew [he] had been with [his] girlfriend all that day.'" ***Id.*** at 14-15.

Here, despite Defendant's noncompliance with the discovery rules, the trial court nonetheless permitted him to present what amounted to alibi testimony. And prior to the introduction of any testimony, defense counsel told the jury in his opening statement that they would hear the following evidence:

> They drive directly to Jack and Connie's house, which is where they left from, . . . They went to the funeral home to help for the final arrangements. They were there for about an hour and a half and they came home.
>
> That week, which is the week in 2012, [Defendant] was never at the house in Republic. It just did not happen. . . .
>
> . . . .
>
> You will hear that it was physically impossible for it to have happened the way that [Victim] described it. He wasn't there. Wasn't there. It didn't happen.

When Defendant presented his evidence, it included direct alibi testimony from two witnesses, Carla and Father. Both testified that they returned home to Aurora -- not Republic -- after the 2012 Florida trip. Both testified that when they returned, Defendant immediately went to the funeral home with Carla, Jack, and Connie. Father added that Defendant did not come to the Republic house after the 2012 Florida trip and did not come to the Republic house much at all. Defendant testified that he could not remember the last time he was at the Republic house, either before or after the 2012 Florida trip. Thus, as in ***Anderson***, Defendant "managed to present" his alibi evidence despite the trial court's ruling. 18 S.W.3d at 16-17.

9

Defendant makes much of the fact that "the jury heard from three State witnesses and only two Defense witnesses in determining" whether the van went to Aurora or Republic. He argues that "the trial court's refusal to allow [Defendant], Jack and Connie to testify that the van went to Aurora, placed a thumb on the State's side of the scale." This claim ignores the fact that Defendant presented three witnesses in his case-in-chief who all testified that Defendant was not at the Republic house after the 2012 Florida trip, versus one State witness – Victim – who said that he was.[4] Based on its verdicts, the jury did not believe the alibi testimony given by Carla and Father, and it did not credit Defendant's general denial. Defendant has failed to demonstrate why similar testimony from two additional witnesses – Defendant's own father and mother – would have changed the outcome.[5] Defendant's argument also ignores that the weight of the evidence is determined by the probative value it is afforded by the fact-finder, not by the quantity of evidence. *See **In re Marriage of Cornella***, 335 S.W.3d 545, 548 (Mo. App. S.D. 2011) ("[t]he weight of the evidence is not determined by mathematics, but depends on its effect in inducing belief").

Given that Defendant was able to present his alibi defense despite the trial court's ruling, Defendant has failed to demonstrate that his trial was fundamentally unfair. *See **Anderson***, 18 S.W.3d at 16-17 (finding no fundamental unfairness to the accused where, despite the court's refusal to allow alibi evidence, the defendant managed to present it anyway). Point one is denied.

---

[4] The other witnesses Defendant complains about – C. and R. – were called by the State in rebuttal.

[5] Further, if Connie had testified that the van went to Aurora and Defendant went to the funeral home, the State could have impeached her with her prior statement to investigators that she did not remember where Defendant went upon their return from the 2012 Florida trip.

*Point 2 – Exclusion of Evidence Regarding a Motion to Modify Custody*

Defendant's second point claims the trial court erred in excluding evidence about child custody litigation between Father and Mother because it was relevant to establish Victim's motive to fabricate allegations of sexual abuse against Defendant.

In an attempt to establish such bias here, Defendant sought to admit

two types of evidence regarding the motion to modify custody dispute: 1) testimony from Carla and [Father] about the accusations [Victim], R[.], and C[.] made about Carla and [Father] as part of that dispute – *i.e.,* that the girls were being treated rudely and not included in activities – and 2) the recordings of the calls between [Father] and [Victim] regarding the change in [health] insurance [for Victim].

It is well-settled that "the interest or bias of a witness and his relation to or feeling toward a party are never irrelevant matters." **Mitchell v. Kardesch**, 313 S.W.3d 667, 676 (Mo. banc 2010) (internal citations omitted). "It has long been recognized that defendants in rape or sexual assault cases should be allowed to introduce evidence that the prosecuting witness's story is a fabrication." **State v. J.L.S.**, 259 S.W.3d 39, 45 (Mo. App. W.D. 2008). While bias is always relevant, the scope of the evidence used to show bias is within the broad discretion of the trial court. **State v. Bounds**, 857 S.W.2d 474, 476 (Mo. App. E.D. 1993).

Under our standard of review:

We review the admission or exclusion of evidence on an abuse of discretion standard. We determine whether the trial court abused its discretion by refusing to admit evidence and not whether the evidence was admissible. "Failure to admit evidence does not mandate a reversal of a judgment unless the error materially affected the merits of the action." We will reverse only where the error is so prejudicial as to deny [the proponent of the excluded evidence] a fair trial. [Footnotes omitted.]

**State v. Freeman**, 212 S.W.3d 173, 176 (Mo. App. S.D. 2007) (internal citations omitted).

Defendant relies on *J.L.S.* in support of his argument. In that case, the Western District held that potentially false police reports the victim and her uncle had made against the defendant were improperly excluded from evidence. 259 S.W.3d at 48 (noting that its holding is "strictly limited to the facts of this case"). The defendant in *J.L.S.* sought to introduce the police reports in order to show that the victim had fabricated her story against defendant because of her loyalty to her aunt and uncle and her animus toward the defendant. *Id.* at 46-47. The defendant argued that the "unsubstantiated reports would have bolstered his fabrication theory and shed light on the extent of the animosity between the two families." *Id.* at 47.

Here, the evidence Defendant argues would have proven Victim's bias was far more attenuated than that presented in *J.L.S.* Defendant attempts to explain his theory of bias as follows.

> The Defense intended to show that [Father]'s children did not want to visit [Father] and Carla every other weekend anymore, so they escalated their accusations to cause a change in the visitation schedule. First, they made allegations that Carla and [Father] were mean to them and they asked [Mother] to file for modification. . . . Since making allegations against Carla did not "fly" and [Victim] became more upset with [Father] about the insurance, [Victim] fabricated the story about Defendant. . . . An allegation that [Victim] was being sexually abused by [Father]'s brother-in-law during the visits with [Father] would achieve [Victim]'s desired outcome of a change in visitation.

In short, Defendant argues that Victim made the accusations against Defendant (Carla's brother) to end the obligation of Victim and her sisters to attend court-ordered visitation with Carla and Father.

The jury had already heard testimony about the acrimonious relationship between Victim and Carla's family. Carla testified that she carried health insurance for Victim – who had scoliosis – and her sisters from 2006 until 2013. Carla testified that she dropped

12

that coverage in 2013 because she "got screamed at and told how horrible [she] was, [she] decided it wasn't [her] responsibility, and [she] -- [she] just felt [Father] could carry them [on his insurance]."

Carla also described a "huge blowup" that occurred at her parents' house over Labor Day weekend in 2013. Carla testified that Victim and her sisters made it obvious that they didn't want to be there, wouldn't speak to anyone or participate in activities, and said unkind things. Father left the gathering with the girls, and Carla understood that Victim and her sisters did not want to come down to visit her parents anymore.

When the prosecutor objected to Defendant presenting evidence of "accusations on civil cases[,]" the trial court sustained the objection and heard arguments from counsel in a bench conference about the admissibility of testimony related to the custody case. As the trial court correctly noted, "Carla and the girls don't get along. So we're there. You've got that established."

Defendant also sought to play recorded phone calls between Victim and Father in order to demonstrate Victim's anger over no longer having health insurance provided by Carla, which caused Victim to have a different doctor perform surgery on her back. Victim's Mother had already testified extensively to the fact that Victim was upset over losing Carla's insurance and having to find a new doctor. Mother characterized the dispute at trial as follows:

[Defense Counsel:]   So you discussed with them a change in insurance?

[Mother:]   And the insurance was discussed with [Victim] because she was getting spinal fusion surgery and she had been with her doctor for two years and knew him and knew he was performing that surgery. So now we had to find a new doctor, which very much upset her. So we had to change doctors.

13

> So I had that discussion with her because you can't just throw it on a child that you are getting your back cut open and now you are going to go to a doctor that you don't know, after you've been with one two to three years. So we had to find a doctor that she would feel comfortable with.

. . . .

[Defense Counsel:]   Do you recall a conversation on the 29th of January between [Victim] and [Father]?

[Mother:]   I don't recall.  But I recall sometime in that time she was upset about her back surgery.

[Defense Counsel:]   And -- and do you recall that -- you took all three of your kids down to the CAC [Child Advocacy Center]; is that correct?

. . . .

[Defense Counsel:]   And it's that same day as the phone call with [Father]; is that correct?

[Mother:]   She had a phone call with him that day?  I don't recollect.

[Defense Counsel:]   Do you recall the -- overhearing it was about insurance?

[Mother:]   No.  I remember her discussing her having to go to a different doctor, and I don't know if it was even that day.  I remember her crying, saying, "Why did you change insurance so I can't have my doctor?"

The trial court did not abuse its considerable discretion in excluding the recordings of the phone calls because the jury had already heard that Victim was upset with Father and Carla about, among other things, the change in health insurance. *See State v. Rios*, 314 S.W.3d 414, 421 (Mo. App. W.D 2010) (police department's use of force reports were properly excluded as duplicative evidence, where other witness testimony had already provided the information that defendant sought from the reports –

14

that he had never used the subject restraint technique in the performance of his official duties).

Because the matters Defendant wanted to get into evidence via the ongoing custody case were fully developed in other testimony, excluding such cumulative evidence did not materially affect his defense. *See **Routt v. State***, 535 S.W.3d 812, 818 (Mo. App. E.D. 2017).

Point 2 is also denied, and the judgment of the trial court is affirmed.

DON E. BURRELL, P.J. – OPINION AUTHOR

NANCY STEFFEN RAHMEYER, J. – CONCURS

GARY W. LYNCH, J. – CONCURS