ATTORNEY FOR APPELLANT: Gregory G. Fenlon, David Alan Perney, Co-Counsel, 601 S. Lindberg, St. Louis, MO 63131, BURTON NEWMAN P.C.
ATTORNEY FOR RESPONDENT: Philip Louis Willman, David Martin Perron, Co-Counsel, Teresa Michelle Young, Co-Counsel, 800 Market Street, Suite 1100, St. Louis, MO 63101, BROWN & JAMES, P.C.
Honorable Mary K. Hoff
Joan Koelling ("Koelling") appeals from the Judgment following a jury verdict in favor of Mercy Hospitals East Communities d/b/a Mercy Hospital Washington, Mercy Clinic Surgical Specialists, L.L.C., Mercy Clinic East Communities (collectively, "Mercy"), and Thomas B. Riechers, M.D. ("Dr. Riechers") on her medical malpractice claims against Mercy and Dr. Riechers. We reverse and remand.
Statement of Facts
On February 10, 2012, Koelling presented to Dr. Riechers complaining of pain in her left lower abdomen. Upon examination, Dr. Riechers believed that Koelling's pain was likely caused either by adhesions-the adherence of inflamed bowels causing scarring-or *546 by diverticulitis-an inflammatory condition whereby diverticula, or outpouchings of the colon that occur when blood vessels penetrate the muscle of the colon wall, become infected. Dr. Riechers ordered a CAT scan to investigate the cause of Koelling's pain and to determine whether a sigmoid colectomy, the removal of the sigmoid colon, should be considered.
On April 20, 2012, Koelling returned to Dr. Riechers for reassessment, and they reviewed the results of the CAT scan. The results showed that Koelling had diverticulosis, an underlying condition that predisposes an individual to diverticulitis. To more concretely determine the cause of Koelling's pain and correct it, Dr. Riechers developed a plan for exploratory surgery. Dr. Riechers informed Koelling of the risks associated with such a surgery, including the possibility that a second surgery might be required to correct any occurrence of fascial dehiscence.[1] Koelling elected to undergo the procedure.
On June 5, 2012, Dr. Riechers performed the surgery on Koelling, discovering extensive abdominal adhesions, adhesions between her right ovary and cecum, and adhesions to her sigmoid colon. Dr. Riechers treated these conditions by separating the abdominal adhesions and removing Koelling's right ovary and her sigmoid colon. After the surgery, Koelling remained at the hospital for two days, and Dr. Riechers discharged her after her condition improved.
On June 27, 2012, however, Koelling returned to Dr. Riechers after having developed a cough and increased abdominal pain. Dr. Riechers ordered a blood test, which was negative for infection, and Koelling requested a CAT scan. Dr. Riechers refused the CAT scan, explaining to Koelling that there was no reason yet, based upon the clinical findings, to pursue one. Dr. Riechers noted that, instead, he would wait to receive laboratory findings, and if they showed an intraabdominal or intra-pelvic problem, he would then order a scan. Dr. Riechers observed no clinical indications of fascial dehiscence.
On July 2, 2012, Koelling returned to Dr. Riechers to report that her cough had not resolved, that she continued to feel abdominal pain, and that she now experienced a "feeling that things are falling out near [her] rectum." Dr. Riechers conducted abdominal and rectal examinations, finding that Koelling's incision looked normal and showed no signs of infection. Dr. Riechers believed that Koelling's pain could be due to pelvic relaxation whereby, due to weakened pelvic muscles, the bladder falls when abdominal muscles are tightened, such as during a cough. Dr. Riechers again found no indication that Koelling developed a fascial dehiscence and ordered no CAT scan.
On July 11, 2012, Dr. Riechers saw Koelling once more, who reported continuing abdominal pain and a sensation of her bladder "falling." Dr. Riechers performed abdominal and rectal examinations, which still showed that the incision was healing normally, and he found no clinical indication of fascial dehiscence. Thus, Dr. Riechers again determined that a CAT scan was unnecessary.
*547 Thereafter, Koelling's condition began worsening, and on July 18, 2012, Koelling presented to the Mercy Hospital Washington Emergency Room where a CAT scan was undertaken before she was, ultimately, sent home.
By July 20, 2012, Koelling's condition had so deteriorated that she was in great discomfort and was not coherent, and she presented to the emergency room at Missouri Baptist Hospital where Dr. Omar Guerra ("Dr. Guerra") undertook her care. Upon reviewing the results of a CAT scan taken that evening, Dr. Guerra found that Koelling had a perforated intestine, low blood pressure, sepsis, and fascial dehiscence. Dr. Guerra performed an emergency operation, stitching the perforated areas before transferring Koelling to intensive care.
Dr. Guerra treated Koelling through the date of trial, which entailed a second surgery on July 21, 2012 to correct certain repairs that had not held, a third surgery three months later, and a diagnosis of fascial dehiscence. Koelling was eventually discharged on August 22, 2012, but required assistance for activities like eating and ambulating, and she continued to feel pain through trial.
On June 13, 2014, Koelling filed her petition alleging medical malpractice against Mercy and Dr. Riechers. On March 6, 2017, Mercy and Dr. Riechers disclosed their intent to call Dr. Kurt Kralovich ("Dr. Kralovich") to testify as to, inter alia , the applicable standard of care. Dr. Kralovich was deposed on April 3, 2017, and he testified that the standard of care did not require Dr. Riechers to perform an abdominal CAT scan to investigate Koelling's symptoms on July 2, 2012. He explained that a physical examination was a more appropriate "first-line test for detecting ... a fascial dehiscence" because a CAT scan with IV contrast exposes patients to risks of anaphylaxis, renal failure, and radiation. Likewise, Dr. Kralovich testified that the standard of care did not require Dr. Riechers to order a CAT scan on July 11, 2012 because Koelling's "vague or persistent" symptoms were reported only five weeks from surgery. Dr. Kralovich explained that, without more, such as an accompanying fever, Koelling's complaints did not "create a scenario where there is a complication from the surgery that you would go in and repair."
During cross-examination of Dr. Kralovich's deposition testimony, Koelling's counsel asked Dr. Kralovich several questions about his involvement as a defendant in prior medical malpractice cases. On that subject, the following exchange occurred:
Q. How many times have you been a defendant in a case?
A. I've been named in a suit, I would estimate, 10 to 12 times.
Q. How did that make you feel being named that many times?
...
A. Like any human being, there are a variety of emotions that come with being sued, from frustration, to sadness, to anger. It's not a pleasant feeling for anyone.
Q. And did that make you angry toward medical malpractice cases?
A. I guess at times you have feelings toward the system, if you will ... When you are named in a lawsuit, obviously it is someone saying something bad about you. It hurts your feelings and makes you feel bad. If you don't think you did anything wrong, I think humans tend to initially become somewhat defensive.
Q. And that made you feel badly about the system itself; correct?
A. I believe it can at times.
*548 Q. For you; correct?
A. I think at times you feel if there was a different way to resolve things.
Q. In the 10 to 12 times you were sued twice for common duct injuries; correct?
A. I have been named twice for common duct injuries.
Q. And in this case, the Deidre Gray-Taylor case, there was a verdict against you; correct?
A. There was.
Q. Did that also make you angry against the system?
A. That one, I'd say initially you're angered. Initially you're frustrated, then there is eventually an acceptance.
Q. Did you think it was fair?
A. To this day I do not believe that that was an appropriate conclusion.
Q. And did that make you then mad at the system?
...
A. After an initial sort of emotion that every human has, I think everyone comes to realize that there has to be a set of rules, that no rules are perfect, and that we have to be a nation of laws, and we follow the laws, and if I have a problem, it's my job to make the laws better. I don't think you have long, deep-seated anger against the society we all live in.
Q. But you were angry at the system and wanted to change it; right?
A. I thought that there is-I think that there is an initial anger that's a human response. I think then logic takes over. I don't have a grudge, a bias, or longstanding change. I'm not going to be a judicial activist. I've gotten over it. Brian Kean and I sit next to each other at our daughters' hockey games now. We can speak cordially. It's not something that affects my objectivity.
Q. Since that date of this verdict, or since 2013, have you ever reviewed a case for a plaintiff?
A. I have not.
Q. How many cases have you reviewed for defendants?
A. Not plaintiffs in medical mal. I've done plaintiff work in Workers' Comp and other areas, but not in a medical malpractice.
Q. And I'm talking about medical malpractice like this Deidre Gray-Taylor case.
A. Correct.
Q. Since that case have you provided testimony in any medical malpractice case on behalf of a plaintiff?
A. No. I've been approached three times, all by defense firms.
Q. And you've provided testimony in all three cases; correct?
A. I have reviewed charts and rendered an opinion. If that's testimony-I've not been deposed, and not gone to trial.
Q. But you have said that you would testify on behalf of the defendant if asked; correct? I think you gave me those three cases.
A. I gave you the three cases. One was definitely-I did not feel there was a violation in the standard of care, and would be supportive if they went forward. One was more of an opinion. This is when there was a retained foreign body, a retained sponge. I don't think that they were going to say that that was okay to do. I think it was more wanting my medical opinion on what was the *549 impact, and the damages phase, and what was reasonable sequela from that; so I don't think an opinion was really gathered as to standard of care in that issue. The other one, the delayed diagnosis of appendicitis, I was prepared to be deposed for the defense in that case.
Q. You also have been sued twice for delayed diagnosis of appendicitis ; correct?
A. I remember one. I don't remember two.
Q. As of 2013 do you remember testifying that you would have been sued twice for a delayed diagnosis of appendicitis ?
A. I don't remember saying that; however, it would not surprise me if I was named and dropped from two suits concerning appendicitis.
On April 5, 2017, counsel for Mercy and Dr. Riechers filed a motion in limine to exclude any reference of Dr. Kralovich's involvement as a defendant in other litigation, arguing that such evidence was irrelevant and would result in unfair prejudice. Mercy and Dr. Riechers' counsel further argued that such evidence would lead to juror confusion because, if admitted, he planned to ask Dr. Kralovich about the details of each case to clarify that many were dismissed, one was settled, and only one resulted in an adverse verdict. Koelling's counsel responded that the evidence went to Dr. Kralovich's credibility and was relevant to show that he was "bias[ed] against medical malpractice claims and that his opinion testimony may be colored by hostility towards medical malpractice lawsuits."
The trial commenced on April 10, 2017. At trial, Dr. Riechers testified that, in his opinion, "[t]here was nothing [he] could have done different[ly]" to prevent Koelling's fascial dehiscence. He explained:
[t]he conduct of her surgery was excellent in every way. She had no intraabdominal injuries. When I did this extensive difficult surgery, she had no leakage from where I connected her bowel together; she had no sign of any kind of problem from the conduct of that procedure; there was nothing another surgeon could have done differently. Her abdominal incision was closed in the way that's recommended, with the sutures that are recommended, and the fact that with all her vigorous coughing that this lasted six weeks before she had this problem, tells me there was no technical error in her care.
Defense witness Dr. Constantine Raptis ("Dr. Raptis"), a diagnostic radiologist, testified that he reviewed Koelling's July 18, 2012 CAT scan report, Koelling's medical records, and the July 20, 2012 CAT scan report. Dr. Raptis testified that his review of the July 18, 2012 CAT scan revealed that, while there was some fascial dehiscence present, all of Koelling's abdominal organs, including the bowel, was still situated in her abdomen and the bowel itself was not inflamed. Thus, Dr. Raptis determined that there was no evidence that Koelling's bowel was in any impending danger of perforation on July 18, 2012. Dr. Raptis testified that he compared his findings against the July 20, 2012 CAT scan and found a "marked difference" between the two in that, while there was no bowel perforation on the July 18 scan, there was a perforation on the July 20 scan. Dr. Raptis clarified, however, that he had no opinion as to the standard of care of Dr. Riechers because Dr. Riechers is a surgeon and Dr. Raptis is not.
On April 13, 2017, immediately prior to Dr. Kralovich's testimony, the trial court revisited the parties' arguments as to Mercy and Dr. Riechers' motion in limine. Koelling's counsel stressed that evidence *550 of prior suits against Dr. Kralovich for malpractice was relevant to his bias such that the jury had a right to hear it. Mercy and Dr. Riechers' counsel reiterated that the evidence was irrelevant and that he feared juror confusion was likely if the evidence was allowed. Ultimately, the trial court granted Mercy and Dr. Riechers' motion in limine, preventing testimony about Dr. Kralovich's prior litigation involvement.
During his testimony, Dr. Kralovich reiterated his deposition testimony that Dr. Riechers abided by the standard of care in his profession. On cross-examination, Dr. Kralovich admitted that he is a paid expert witness making approximately $2,500 for his work prior to trial with an additional $1,600 for testifying, that he testifies for the defense approximately 90% of the time, and that he had testified for counsel for Dr. Riechers and Mercy in a separate case. Immediately before Dr. Kralovich was dismissed, the parties stipulated to submitting Dr. Kralovich's deposition as an offer of proof as to what he would have testified to on the subject of his prior litigation history, with the additional facts that out of those ten or twelve suits, all were dismissed except for one that was settled and one that resulted in an adverse verdict.
At the close of all evidence, the jury returned a verdict in favor of Mercy and Dr. Riechers. On May 9, 2017, Koelling filed a motion for new trial, arguing that the exclusion of Dr. Kralovich's prior litigation involvement was improper because the evidence was essential to establish his bias. On August 7, 2017, the trial court denied the motion, and on August 22, 2017, the trial court entered judgment in favor of Mercy and Dr. Riechers. Koelling's appeal follows.
Standard of Review
"A trial court enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal." Payne v. Fiesta Corporation, 543 S.W.3d 109, 122 (Mo. App. E.D. 2018) (quoting Cox v. Kansas City Chiefs Football Club, Inc., 473 S.W.3d 107, 144 (Mo. banc 2015) ) (quotation marks omitted). A ruling is an abuse of discretion where it is "clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." Id. (internal quotation marks omitted).
Exclusion of Reference to Prior Medical Malpractice Lawsuits Against Dr. Kralovich
In her sole point, Koelling argues that the trial court abused its discretion in prohibiting her from introducing evidence during cross-examination of Dr. Kralovich's involvement as a defendant in past medical malpractice lawsuits because such evidence was relevant to show Dr. Kralovich's bias against medical malpractice claims. We agree.
"[T]he interest or bias of a witness and his relation to or feeling toward a party are never irrelevant matters." Mitchell v. Kardesch, 313 S.W.3d 667, 676 (Mo. banc 2010). "If a witness is hostile, biased, or prejudiced against a party, the substance of his testimony may be affected by his other-than-impartial state of mind." Newell Rubbermaid, Inc. v. Efficient Solutions, Inc., 252 S.W.3d 164, 172 (Mo. App. E.D. 2007) (quoting State v. Hedrick, 797 S.W.2d 823, 828 (Mo. App. W.D. 1990) ). Thus, "[t]he party should be afforded an opportunity to display before an uninformed jury the bias, hostility, or prejudices held by the witness against that party."
*551 Id. During cross-examination of an expert witness, "parties are to be given wide latitude to test qualifications, credibility, skill or knowledge, and value and accuracy of opinion." Montgomery v. Wilson, 331 S.W.3d 332, 341 (Mo. App. W.D. 2011) (internal quotation marks and citation omitted). "It is well settled under Missouri law that a witness may be impeached on cross-examination through the use of evidence demonstrating the witness's bias, interest, or prejudice." Menschik v. Heartland Regional Medical Center, 531 S.W.3d 551, 557 (Mo. App. W.D. 2017). This method "long has been permitted in Missouri, subject to the court's discretion in limiting or, in rare instances, precluding such evidence entirely so as to avoid undue prejudice." Mitchell, 313 S.W.3d at 676. This is because the "jury is entitled to know information that might affect the credibility of the witness [and] the weight to give his testimony." Montgomery, 331 S.W.3d at 341.
On appeal, Koelling argues that during Dr. Kralovich's deposition testimony, he admitted to feelings of hostility arising out of "his embittered experiences as a defendant in multiple medical malpractice lawsuits." She claims, therefore, that she should have been permitted to cross-examine Dr. Kralovich about those prior cases to demonstrate his bias against malpractice claims to the jury. In response, Mercy and Dr. Riechers argue that exclusion of the evidence was proper because, in fact, nothing in Dr. Kralovich's deposition testimony, including his testimony about his litigation history, demonstrated that he harbored any bias. In support, they note that, while Dr. Kralovich testified that he was frustrated with the legal system as a result of being sued, those "feelings of anger and frustration ... were not outside the bounds expected of any defendant," and that, in any event, Dr. Kralovich testified that his "initial emotional reaction[s] faded [once] logic took over." Thus, they claim that the existence of prior malpractice cases against Dr. Kralovich was "wholly irrelevant to any fact at issue in the case" and was "nothing more than a collateral matter" properly excluded by the trial court since "impeachment of a witness with evidence regarding a collateral matter is improper." Mercy and Dr. Riechers' argument is unavailing.
First, we reject Mercy and Dr. Riechers' claim that Dr. Kralovich's deposition testimony clearly established that he harbored no bias. To the contrary, Dr. Kralovich explicitly stated that, at least initially after being sued, he felt "badly" about the legal system, that he was "angered" and "frustrated," and that "[t]o this day" he did not believe that the case resulting in a verdict against him "was an appropriate conclusion." Moreover, while Mercy and Dr. Riechers argue that Dr. Kralovich's testimony that he had "gotten over" his feelings of hostility absolved him of any bias, it is the "jury [which] must determine the witness's credibility and the weight to give [his or] her testimony." Moon v. Hy-Vee, Inc., 351 S.W.3d 279, 284 (Mo. App. W.D. 2011) (emphasis added); see also Cox v. Kansas City Chiefs Football Club, Inc., 473 S.W.3d 107, 126 (Mo. banc 2015) ("[I]t is the responsibility of the jury, not the court, to determine the credibility of witnesses, resolve conflicts in testimony, and weigh evidence.") (internal quotation marks and citation omitted); and Koppe v. Campbell, 318 S.W.3d 233, 248 (Mo. App. W.D. 2010) ("The jury is the sole judge of the credibility of witnesses and the weight and value of their testimony and may believe or disbelieve any portion of that testimony."). Mercy and Dr. Riechers' assertion that Dr. Kralovich's deposition testimony supports no claim of *552 bias, therefore, is unpersuasive on the issue of whether the evidence was properly excluded.
Here, Koelling sought to cross-examine Dr. Kralovich about his litigation experience for the purpose of demonstrating that the volume of cases brought against him biased him against malpractice claims. "[B]ias or prejudice of a witness is not collateral and can always be shown subject to the limitations imposed by the trial judge in his sound discretion." Montgomery, 331 S.W.3d at 341 (internal quotation marks and citation omitted). "Parties are permitted to introduce extrinsic evidence to impeach a witness by showing his or her ... prejudice or interest in the proceeding, regardless of whether the subject of the extrinsic evidence is independently material to the case." Mitchell, 313 S.W.3d at 679. Thus, "[c]ross-examination of a witness as to previous or unrelated cases a witness has had involvement in is permissible in the context of bias." Montgomery, 331 S.W.3d at 342 ; see also Moon, 351 S.W.3d at 284 (It is not "improper to attempt to show bias by the witness's participation in unrelated cases."). Because Koelling intended to use evidence of prior lawsuits against Dr. Kralovich to demonstrate his bias, the evidence was relevant and admissible. The issue, then, is whether the trial court abused its discretion in excluding such evidence during cross-examination.
Mercy and Dr. Riechers argue that it was within the trial court's discretion to exclude the evidence at issue because it could have found that introduction of prior unrelated lawsuits against Dr. Kralovich would have been highly prejudicial. They argue that introduction of the evidence would have likely confused the jury and simply "would not have added much" because some evidence of Dr. Kralovich's bias had already been revealed through his admissions that he is a paid expert who testifies for the defense 90% of the time and who had previously worked for Mercy and Dr. Riechers' counsel.
It is true that "much is left to the discretion of the trial court as to how far the inquiry [into a witness' bias] may go into the details of the difficulty, disagreement or other transaction which caused the hostility, prejudice or ill feeling." Mitchell, 313 S.W.3d at 681 (quoting State v. Solven, 371 S.W.2d 328, 331 (Mo. banc 1963) ). "However, it is one thing ... to call a halt to over-extended, irrelevant or repetitive cross-examination-which is within the trial court's discretion-and quite another to rule off limits an entire area of inquiry which has a bearing upon the witness's veracity." Newell Rubbermaid, Inc., 252 S.W.3d at 172 (quoting State v. Hedrick, 797 S.W.2d 823, 828 (Mo. App. W.D. 1990) ). "While the trial court may properly limit the scope and extent of cross-examination into the witness' bias or prejudice, [it] is not within the trial court's discretion to prevent it entirely." Id. (internal quotation marks omitted).
Here, the trial court might have, within its discretion, limited the scope of Koelling's inquiry about prior malpractice lawsuits against Dr. Kralovich to prevent juror confusion or restrict potentially cumulative evidence. By prohibiting Koelling from engaging in any inquiry at all about Dr. Kralovich's litigation experience, however, the trial court completely foreclosed a subject Koelling sought to use to demonstrate Dr. Kralovich's bias. The trial court abused its discretion in doing so. See, e.g., State v. Clark, 364 S.W.3d 540, 544-45 (Mo. banc 2012) (abuse of discretion in prohibiting defendant from cross-examining witness about his potential bias stemming from his expressed hope for leniency in possible future sentencing in exchange for his testimony *553 against defendant); and Thornton v. Vonallmon, 456 S.W.2d 795, 799 (Mo. App. 1970) (holding that prior sexual relationship between plaintiff and her witness was proper subject tending to show bias and that, while trial court could prohibit defendant from inquiring into specific occasions or particular acts, it could not prohibit all inquiry into the relationship by defendant).
Mercy and Dr. Riechers nevertheless argue that Koelling was not prejudiced by the trial court's abuse of discretion because Dr. Kralovich was not the sole source of testimony on the issue of "whether the medical standard of care required a [CAT] scan on July 2 or July 11, 2012." They claim that even if evidence of Dr. Kralovich's litigation history had been introduced, and the jury had found him not to be credible, the jury could have relied on the testimonies of Dr. Raptis and Dr. Riechers as well as admissions by Dr. Guerra on cross-examination to reach the same verdict. This argument is unavailing.
First, Dr. Raptis provided no testimony as to Dr. Riechers' adherence to the standard of care as a surgeon. Rather, Dr. Raptis was called to testify about the contents of Koelling's July 18 and July 20, 2012 CAT scan reports, and in fact, Dr. Raptis testified that he had no opinion as to the standard of care used by Dr. Riechers because he is a diagnostic radiologist, not a surgeon. Second, since we do not know whether, on the issue of standard of care, the jury found Dr. Riechers' and Dr. Kralovich's testimonies credible, only Dr. Riechers' credible, or only Dr. Kralovich's credible, we cannot know which testimony the jury relied upon in rendering its verdict for the defense. Thus, we cannot assume that the jury would reach the same conclusion in a situation where we ignore Dr. Kralovich's standard-of-care testimony, since it may be that the jury relied exclusively on Dr. Kralovich's testimony in reaching the verdict it did. Third, the cross-examination testimony of Dr. Guerra cited by Mercy and Dr. Riechers does not support their assertion that he admitted that Dr. Riechers abided by the standard of care. Mercy and Dr. Riechers claim that, on cross-examination, Dr. Guerra agreed that, where Koelling complained of a sensation that "things are falling out of her rectum," it was "a reasonable thing for him to be thinking" that Koelling was suffering from a problem in her pelvis instead of fascial dehiscence "given his ... anal examination finding." Their argument, however, takes Dr. Guerra's testimony out of context. While Dr. Guerra testified that Dr. Riechers' belief was consistent with the findings of his physical examination alone , Dr. Guerra clarified that Dr. Riechers breached the standard of care by failing to conduct "more investigat[ion] than a ... physical examination," i.e. , through CAT scans of Koelling's abdomen on July 2 and July 11, 2012, which likely would have shown a fascial dehiscence.
Here, the trial court's abuse of discretion in preventing any inquiry into Dr. Kralovich's prior litigation history prejudiced Koelling. On the issue of standard of care, the defense relied mainly on the testimonies of Dr. Kralovich and the treating physician, Dr. Riechers, who as the defendant had a motive to testify in such a way that avoided liability. Evidence tending to show that Dr. Kralovich had an interest in coloring his own opinion testimony in order to serve his own personal ends was "essential to the jury's process of determining the appropriate weight to be given to [his] testimony." Brown v. Brown, 530 S.W.3d 35, 46 (Mo. App. E.D. 2017) (citing Newell Rubbermaid, Inc., 252 S.W.3d at 172 ) (emphasis added). Koelling, however, was not "afforded an opportunity to display before [it] the bias, hostility, or prejudices *554 held" by Dr. Kralovich, and there is a reasonable probability that the trial court's refusal to allow Koelling to do so affected the outcome of the trial. Newell Rubbermaid, Inc., 252 S.W.3d at 172 ; see also, State v. Winfrey, 337 S.W.3d 1, 8-9 (Mo. banc 2011) (trial court's refusal to allow defendant to cross-examine witness about evidence showing witness' interest to lie about defendant's acquisition of an unrecovered firearm allegedly used in murder was prejudicial because there was "a reasonable probability that the trial court's refusal ... affected the outcome of the trial"); and Clark, 364 S.W.3d at 545 (where State's case relied on testimony of two witnesses, trial court's refusal to allow defendant to cross-examine one witness about his expressed hope for leniency in possible future sentencing for his testimony against defendant was prejudicial because such evidence might "have tipped the balance in the minds of the jurors" causing them to disbelieve him).
Point granted.
Conclusion
The Judgment is reversed and the case is remanded for further proceedings consistent with this opinion.
Philip M. Hess, Presiding Judge and Robert G. Dowd, Jr., Judge: Concur

Uncontested testimony at trial from Dr. Riechers and Dr. Omar Guerra indicated that abdominal fascia is a "gristle"-like tissue that surrounds and separates the muscles of the abdominal wall. When performing an operation in a patient's abdomen, a surgeon must cut through the muscle to reach the abdominal viscera, and upon completion of the surgery, the muscle is sewn up over the abdominal viscera. Abdominal dehiscence occurs when the fascia heals improperly such that it parts, leaving nothing to keep the abdominal viscera inside the abdomen.