In the Missouri Court of Appeals
 Eastern District
 DIVISION TWO

STATE OF MISSOURI, ) ED108022
 )
 Respondent, ) Appeal from the Circuit Court
 ) of the City of St. Louis
v. ) 1722-CR01106-01
 )
DESMOND ARTEZ MILLS, ) Honorable Michael W. Noble
 )
 Appellant. ) Filed: March 30, 2021

 Desmond Artez Mills (Appellant) appeals from the trial court’s judgment, following a

jury trial, convicting him of (Count I) first-degree murder, in violation of Section 565.020 1;

(Count II) armed criminal action, in violation of Section 571.015; and (Count III) unlawful use

of a weapon, in violation of Section 571.030. He was sentenced to two concurrent terms of life

in prison on Counts I and II, and a term of 15 years on Count III to run consecutively with Count

I. The sentences for Counts I, II and III were to run consecutively with Appellant’s sentence in a

separate case in St. Louis County, No. 16SL-CR08833-01. We affirm.

 BACKGROUND

 On October 31, 2016, Appellant went with his then-girlfriend, Latraneice Duncan

(Duncan) to a pawn shop where she purchased a handgun. She brought it to her home in Lemay

1
 All statutory references are to RSMo (2016) as updated, unless otherwise indicated.
and put it in a purse in her closet. Appellant also lived there and did not have permission to use

the gun, but he photographed the gun with his phone.

 The next day, Duncan took Appellant to a 7-Eleven to meet Douglas Coats (Victim).

Appellant and Victim exchanged numerous phone calls and texts throughout that day and into

the next morning. They referenced doing “business,” “playing games,” and Victim not being a

“baby.” One message referred to “Ol gal” planning to call the police, and another message from

Appellant advised Victim that he had heroin for Victim. Their final text message at 3:09 a.m. on

November 2, 2016, indicated Appellant was on his way to his mom’s house. Around 6:15 a.m.

on November 2, Appellant dropped Duncan off at work and took her car. About three hours

later, shortly after 9 a.m., Appellant called Victim one last time.

 Around 9:15 a.m., near the intersection of Winnebago and Wisconsin in St. Louis, Joyce

Griffin (Witness) was getting ready for work when she heard a gunshot and then a vehicle speed

away. She went outside and saw Victim leaning over in the driver’s seat of a car in the street.

She recognized him as someone who she “always” saw in the neighborhood. She first thought

he was drunk, but then she came close enough to see he had been shot and was dead.

 Police arrived to find Victim had been killed by a gunshot wound to the neck. There was

a bullet hole in the rear driver’s seat window. Victim’s car was still in gear and his foot was on

the brake. No firearms were located in the vehicle and there were no signs of a struggle.

Victim’s cell phone was recovered from the car, along with controlled substances. Heroin and

cocaine were packaged in a manner consistent with sales.

 Up the street from Victim’s vehicle, police found an empty shell casing and a cell phone

in the street. Examination of the phone revealed it belonged to Appellant and included records

of all the phone calls and text messages between Appellant and Victim, including the call

 2
minutes before Victim was murdered. Based on the phone, Appellant was identified as a person

of interest in the investigation.

 On December 5, 2016, Appellant was home with Duncan and had possession of her gun,

even though Duncan had never told him where she kept it. Police were called to the scene where

they recovered the gun. Tests showed that it fired the shell casings found at the crime scene and

was of the same class that fired the bullet recovered from Victim.

 An autopsy conducted on Victim revealed he was killed by a single gunshot that entered

his neck and went through his thyroid gland, trachea, two major blood vessels, and his lung. The

bullet exited the right side of Victim’s chest and then entered his arm. The bullet jacket was

recovered from Victim’s neck wound and the core from his arm. The trajectory and lack of

stippling demonstrated the gun was likely fired from outside the car. Victim’s injuries were

consistent with a shot fired through the rear driver’s seat window where the bullet hole was

found.

 The State of Missouri (State) charged Appellant as a prior offender with first-degree

murder, armed criminal action, unlawful use of a weapon, and unlawful possession of a firearm. 2

Prior to trial, Appellant filed a “Request for a Daubert 3 Hearing” regarding the toolmark

examination conducted that linked the shell casing found at the scene to the gun owned by

Duncan and possessed by Appellant. The trial court denied the motion for a Daubert hearing.

The State filed a motion in limine to prohibit defense counsel from cross-examining the State’s

toolmark and firearms experts about information contained in reports authored by the National

Academy of Science (NAS) from 2009 and Presidential Council of Advisors on Science and

2
 Unlawful possession of a firearm, Count IV, was dismissed by the State.
3
 Daubert refers throughout this opinion to Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 595 (1993).

 3
Technology (PCAST) from 2015, especially asserting a “false positive” rate as fact in toolmark

examination. The trial court granted the State’s motion in limine to prevent a cross-examination

of the toolmark experts about the NAS and PCAST reports. The relevant facts regarding the pre-

trial hearings and testimony on toolmark examination will be discussed in greater detail in the

Analysis of Points III and IV.

 The first three counts were tried by a jury. Appellant presented no evidence in his

defense. The jury found him guilty on all three counts and sentenced him to life without parole

for murder, a concurrent term of life for armed criminal action, and a consecutive term of 15

years for unlawful use of a weapon. The sentence was to run consecutively with the sentence

Appellant received in a separate case in St. Louis County, where he was convicted of two counts

of domestic assault in the second degree. This appeal follows.

 DISCUSSION

 Appellant raises five points on appeal. His first two points allege the trial court erred in

denying his motion for judgment of acquittal, denying the motion for new trial, and imposing

sentences on Appellant for Counts I, II, and III, in that the evidence did not prove the crimes

beyond a reasonable doubt. Appellant’s third and fourth points allege the trial court abused its

discretion in prohibiting defense counsel from cross-examining the State’s toolmark expert,

Officer David Menendez (Menendez), and denying his request for a Daubert hearing.

Appellant’s fifth point alleges the trial court erred in denying his motion for judgment of

acquittal, and in denying the motion for new trial, because the cumulative effect of all the errors

in Points I through IV resulted in a miscarriage of justice. We will discuss Appellant’s points in

the order raised.

 4
 Points I and II

 Appellant’s first two points allege the trial court erred in denying his motion for judgment

of acquittal, denying the motion for new trial, and imposing sentences on Appellant for Counts I,

II, and III, in that the evidence did not prove the crimes beyond a reasonable doubt. His first

point alleges the trial court erred in denying his motion for judgment of acquittal at the close of

the State’s evidence, denying the motion for new trial, and in imposing sentences on Appellant

for Count I, first-degree murder, and the associated Count II, armed criminal action, in that the

evidence did not prove beyond a reasonable doubt that Appellant was the shooter or had the

specific intent necessary to commit the charged murder against Victim. Appellant’s second point

alleges the trial court erred in denying his motion for judgment of acquittal at the close of all the

evidence, denying the motion for new trial, and imposing sentences on Appellant for Count III,

unlawful use of a weapon, in that the evidence did not prove beyond a reasonable doubt that

Appellant knowingly discharged a firearm at a motor vehicle. Appellant alleges the trial court’s

errors prejudiced him by depriving him of his right to due process of law, as guaranteed by the

Fourteenth Amendment to the U.S. Constitution, and Article I, Section 10 of the Missouri

Constitution. Appellant urges this Court to reverse his conviction on Counts I, II, and III and

discharge him.

 Standard of Review

 In reviewing the trial court’s denial of a motion for judgment of acquittal, the Court must

determine if the State presented sufficient evidence to make a submissible case. State v.

Johnson, 244 S.W.3d 144, 152 (Mo. banc 2008). We determine whether there is sufficient

evidence from which a reasonable juror may have found the defendant guilty beyond a

reasonable doubt. Id. This Court views the evidence in the light most favorable to the judgment,

 5
disregarding any contrary evidence, and grants the State all reasonable inferences from the

evidence. Id. However, an appellate court “may not supply missing evidence, or give the [S]tate

the benefit of unreasonable, speculative or forced inferences.” State v. Clark, 490 S.W.3d 704,

707 (Mo. banc 2016) (quoting State v. Whalen, 49 S.W.3d 181, 184 (Mo. banc 2001) (overruled

on other grounds)). We give deference to the jury as the trier of fact, in their superior position, to

assess the credibility of witnesses and the weight and value of their testimony. Johnson, 244

S.W.3d at 152.

 The State may meet its burden of proof by presenting either direct or circumstantial

evidence connecting the defendant to each element of the crime. State v. Burns, 444 S.W.3d

527, 529 (Mo. App. E.D. 2014). Furthermore, circumstantial evidence is given the same weight

as direct evidence in considering whether there was sufficient evidence to support a conviction.

State v. McBenge, 507 S.W.3d 94, 104 (Mo. App. E.D. 2016).

 Analysis
 Point I

 Appellant’s first point alleges the trial court erred in denying his motion for judgment of

acquittal at the close of the State’s evidence, denying the motion for new trial, and in imposing

sentences on Appellant for Count I, first-degree murder, and the associated Count II, armed

criminal action, in that the evidence did not prove beyond a reasonable doubt that Appellant was

the shooter or had the specific intent necessary to commit the charged murder against Victim.

The State contends the evidence was sufficient to identify Appellant as the murderer and

demonstrate his deliberation.

 A person commits the crime of first-degree murder if “he or she knowingly causes the

death of another person after deliberation upon the matter.” Section 565.020.1. “Deliberation”

is defined as “cool reflection for any length of time no matter how brief[.]” Section 565.002(5).

 6
The requirement of deliberation distinguishes first-degree murder from all other forms of

homicide. State v. Glass, 136 S.W.3d 496, 514 (Mo. banc 2004). Deliberation does not require

that the defendant be detached or disinterested; it does not require any length of time to pass

before the killing, as an instant is sufficient. State v. Perkins, 600 S.W.3d 838, 846 (Mo. App.

E.D. 2020) (citing State v. Nathan, 404 S.W.3d 253, 266 (Mo. banc 2013)). Rather, deliberation

requires that the defendant acted consciously, and not reflexively. Id. at 847. Deliberation may

be proved by indirect evidence and inferences reasonably drawn from the circumstances

surrounding the killing. Id. (quoting State v. Johns, 34 S.W.3d 93, 110 (Mo. banc 2000)).

Deliberation can be inferred from evidence of planning. State v. Vickers, 560 S.W.3d 3, 22 (Mo.

App. W.D. 2018). An inference of deliberation can also be strengthened by post-shooting flight

without providing aid to the victim. State v. Sanders-Ford, 527 S.W.3d 223, 226 (Mo. App. S.D.

2017). Similarly, intent can be inferred from the use of a deadly weapon on some vital part of

the victim’s body. State v. Alexander, 505 S.W.3d 384, 394 (Mo. App. E.D. 2016). The act of

aiming and intentionally firing a gun at a victim supports an inference of a “cool and deliberate

state of mind.” See State v. Morris, 844 S.W.2d 549, 551-52 (Mo. App. S.D. 1992).

 The evidence on the record was sufficient to show Appellant knowingly caused the death

of Victim after deliberation. Appellant and Victim were at least acquaintances and sufficient

evidence demonstrates they were involved in drug distribution. In addition to the references they

made to their “business” and exchanging heroin, Victim’s car contained controlled substances

packaged as if he were distributing them when he was found dead. Based on the final text

messages that someone was playing games, Victim not being a baby, and “Ol gal” planned to

call the police, an inference can be made that they feared trouble with the police. This supports a

motive for Appellant to end the drug relationship with Victim by murdering him.

 7
 Appellant called Victim shortly after 9 a.m. and just before the murder occurred. Victim

was found in an area where he was regularly seen. The shot that killed Victim most likely came

from behind. This evidence combines to support the inference that Appellant planned to bring

Victim to a familiar area but Appellant remained out of his sight to avoid detection when he shot

Victim while he was not looking. The wound to Victim’s neck and shell casings found some

distance from Victim’s body also demonstrate Appellant’s intent to kill by use of a deadly

weapon, shot into a vital part of Victim’s body from a location far enough away to require

Appellant’s careful and precise aim. This evidence is sufficient to support an inference that the

State proved the element of deliberation.

 Additional evidence identified Appellant as Victim’s murderer. Up the street from

Victim’s vehicle and body, police located Appellant’s cell phone and a shell casing near each

other. The cell phone’s user accounts had Appellant’s name on them. The shell casing was fired

from a gun owned by Appellant’s girlfriend and kept in the same residence where Appellant

lived. Appellant photographed the gun with his phone just prior to the murder. The bullet was

consistent with the same gun, although it was not matched to the gun. This is sufficient to

connect Appellant to the crime at issue.

 Even more evidence here provides proof beyond a reasonable doubt that Appellant

committed this murder. Witness heard the shooting, and she immediately heard a vehicle speed

away. The jury could reasonably infer this vehicle speeding away was involved in the shooting

and did not attempt to aid Victim. Again, the jury had sufficient evidence to draw the conclusion

that Appellant murdered Victim after deliberation. The trial court did not err in denying

Appellant’s motion for judgment of acquittal for first-degree murder and the associated charge of

armed criminal action. Point I is denied.

 8
 Point II

 Appellant’s second point alleges the trial court erred in denying his motion for judgment

of acquittal and the close of all the evidence, denying the motion for new trial, and imposing

sentences on Appellant for Count III, unlawful use of a weapon, in that the evidence did not

prove beyond a reasonable doubt that Appellant knowingly discharged a firearm at a motor

vehicle. The State argues evidence showing Appellant shot Victim in the left side of the neck

from a distance and immediately fled the scene supports an inference that Appellant shot “at” a

motor vehicle to prove beyond a reasonable doubt that Appellant committed unlawful use of a

weapon.

 Section 571.030.1(9) provides that:

 1. A person commits the crime of unlawful use of a weapon if he or she knowingly:
 . . . (9) Discharges or shoots a firearm at or from a motor vehicle, . . . , discharges
 or shoots a firearm at any person, or at any other motor vehicle, or at any building
 or habitable structure, unless the person was lawfully acting in self defense[.]

 Appellant was charged with unlawful use of a weapon for knowingly discharging a

firearm at a motor vehicle on November 2, 2016. The State presented evidence at trial of a bullet

hole in the rear driver’s seat window of Victim’s vehicle. The injury causing Victim’s death was

consistent with the same shot fired through that window. The trajectory and lack of stippling

demonstrated that the gun was likely fired from outside the car. The evidence further proved that

the shot came from behind, such that Victim did not see it coming; Victim had no weapons with

him, and it is reasonable to infer the shot from behind was not in self-defense. The shell casing

found near Appellant’s cell phone and up the street from Victim further provided sufficient

evidence linking Appellant to the crime of unlawful use of the weapon recovered from his

possession.

 9
 Together, this was sufficient evidence from which a jury could find proof beyond a

reasonable doubt that Appellant was guilty of unlawful use of a weapon for knowingly

discharging a firearm at Victim’s motor vehicle on November 2, 2016. The trial court did not err

in denying Appellant’s motion for judgment of acquittal on this count. Point II is denied.

 Points III and IV

 Both Appellant’s third and fourth points allege the trial court abused its discretion with

regard to the State’s toolmark expert testimony, both in prohibiting defense counsel from cross-

examining the toolmark expert, and in denying a Daubert hearing regarding the toolmark

examination expert testimony. With similar facts and law at issue, we will review these two

points together.

 Appellant filed a pre-trial request for a Daubert hearing arguing that toolmark analysis

does not meet the Daubert standard because it is untested and subjective according to the NAS

and PCAST reports. The motion suggested that not enough facts or data exist to state with

confidence that one can match a particular bullet or shell casing to a particular firearm. Further,

no identifiable set of procedures and protocols support what the examiner did was reliable, what

the false positive rates are, whether the subjective testing methods employed were reliably

applied to the case, or whether the subjective testing methods used could be replicated. During

the pre-trial conference on April 2, 2019, the trial court denied Appellant’s request for a Daubert

hearing.

 The State filed a motion in limine requesting the trial court prohibit defense counsel from

cross-examining the State’s toolmark and firearms experts, Menendez and Michael Wunderlich,

about the NAS and PCAST reports. The State reported that during his deposition, Menendez

was confronted with the reports and told Appellant that the studies were not authoritative in the

 10
field of firearms and toolmark examination, but were “significantly flaw[ed].” The motion noted

that Appellant had not endorsed any expert witnesses to lay a foundation establishing that the

reports were authoritative, and the court had not taken judicial notice of the reports.

 At a hearing on the motion, Appellant did not present any evidence establishing the

authoritative nature of the reports, but instead merely argued that they were authoritative because

they were written by “respected,” “elite,” and “prestigious” organizations, and because courts in

other jurisdictions had found them authoritative. Appellant argued that the Department of Justice

had modified its guidelines for tool mark examiners in direct response to the PCAST report,

which found they could no longer state a “zero error rate[],” “that tool mark examiners could no

longer say that they could exclude all other firearms as the source of a bullet, which was typical

of firearms examiners before the PCAST report.”

 The State cited State v. Carter, 559 S.W.3d 92, 96 (Mo. App. W.D. 2018), in support of

its motion to prohibit cross-examination regarding the NAS and PCAST reports. Appellant

argued the Carter case was not controlling. The trial court agreed with Carter and held the

reports should have been discussed through a battle of experts. With regard to judicial notice,

the court stated:

 You're requiring me to take on a skill set that the Court doesn't have. I mean, what
 you've shown me is that other people in the field have used this report. Now, I don't
 know if those other people have used it because an expert told them to use it, but
 right now I have a defense attorney saying use it, I have a state's attorney saying
 don't use it, and the only people that have experts are the State.

 The court further stated that their motion hearing was effectively a “miniature Daubert

hearing” but only heard one side of the issue because the defense simply argued the documents

should be used without the support of an expert witness. The court granted the State’s motion in

 11
limine to prevent cross-examination of the toolmark experts specifically based upon the NAS

and PCAST reports.

 During trial, Menendez testified that he had worked in firearms examination for 20 years

following his retirement from the police force. He explained that he had examined a .45 caliber

cartridge case from the crime scene, which he entered into the National Integrated Ballistic

Imaging Network (NIBIN) database. He explained it was not a “match” because

 We're looking at two digital images on a flat screen, two dimensional, and we line
 them up and look at them, they look good. We will not confirm or verify it as a hit
 until we look at it under a comparison microscope, which also gives you 3D in the
 different lighting. And then we verify it, a second examiner comes up then behind
 me and also verifies that it's a match before we release it as a confirmed hit.

On cross-examination, Menendez again explained that the NIBIN hit examination only confirms

an association and does not mean there was a match between the shell casing and the firearm.

He used microscopic testing to compare them and, based on a finding of eight “lands and

grooves with a polygonal rifling,” he could say the bullet from Victim’s body was “most likely

from a Glock or a Bersa made .45 caliber gun.”

 Menendez testified he also used test shots to compare them to the cartridge case from the

crime scene evidence. He concluded that the cartridge casings had matching firing pin and

breech face impressions; therefore, he found this particular cartridge case that was recovered at

the scene was fired from that firearm.

 He also looked to individual characteristics, unique to one firearm, such as imperfections

in the metal and wear and tear on the tool making them, which make individual marks on a

particular firearm and transfer over in repeatable test shots. He explained that the pattern

recognition was used to find an identification or elimination, pursuant to the Association of

Firearms and Tool Mark Examiners (AFTE) organization standard. He said pattern recognition

 12
did not have a quantifiable number, but the examiner’s training and experience helps to find

enough marks in the totality of the breech face area to call it an identification or elimination. He

agreed that was determined by the examiner, but the verification process allowed another well-

qualified examiner to repeat the process. The examiners fire a series of test shots, look at the test

shots to make sure they match each other and that the gun is producing reproducible

characteristics. They look at what is not reproducible, the class, sub-class, and individual

characteristics. All lab reports are reviewed by at least one other analyst; this case used a third

examiner and all three agreed with the findings.

 On cross-examination, Menendez confirmed he could not say the shell casing he

examined from the scene and the bullet from the Victim’s body were fired from the same

firearm. He could only say that the cartridge case was fired from the firearm. Defense counsel

asked Menendez about cognitive bias in knowing the result that law enforcement wanted and

how to safeguard against it, so it did not subconsciously affect the examination. Menendez

answered, “I refuse to believe that. We are trained, we have evidence that can be looked at

again, reproduced, additional set of test shots.” He knew there was a chance for false positives

and those did occur in the NIBIN system, but he would never start examination of a case with a

predetermined opinion.

 Following Menendez’s testimony, defense counsel made an offer of proof outside of the

jury’s presence, “that both the NAS and the PCAST report came to the conclusion that there

were not an identifiable certain set of procedures that were reproducible. . . . Which is directly

contrary to what Officer Menendez testified to.” Defense counsel continued that the reports

“recommended that the science is not solid enough to be able to claim an exact match, which, as

we've discussed earlier in the week, the DOJ now does not even allow their examiners to testify

 13
to the amount of certainty that Officer Menendez testified to today.” He added that he wanted to

cross-examine Menendez with regard to the error rates in the studies collected in the PCAST

report, and specifically, that there were about one in forty.

 Point III

 Appellant’s third point alleges the trial court abused its discretion in prohibiting defense

counsel from cross-examining the State’s toolmark expert, Menendez, about the findings,

reliability, or error rates of toolmark and firearm examinations in violation of his right against

confrontation of witnesses, right to due process of law, and right to a fair trial, as guaranteed by

the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 10

and 18(a) of the Missouri Constitution. Appellant alleges he was prejudiced in that the court’s

error was not harmless and there was not overwhelming evidence of guilt. Appellant alleges

that, had defense counsel been allowed to cross-examine Menendez about the findings,

reliability, or error rates of toolmark and firearm examinations, defense counsel would have

impeached the validity, opinion, and reliability of the State’s toolmark expert that the gun and

shell casing were a match. Appellant urges this Court to reverse his convictions and sentences

and remand for a new trial.

 Standard of Review

 “It is well established that the extent and scope of cross-examination . . . is within the

discretion of the trial court and will not be disturbed unless an abuse of discretion is clearly

shown.” Klotz v. St. Anthony's Med. Ctr., 311 S.W.3d 752, 765 (Mo. banc 2010), as

modified (May 25, 2010) (internal citations omitted); State v. Gardner, 8 S.W.3d 66, 72 (Mo.

1999), as modified on denial of reh'g (Jan. 11, 2000). An abuse of discretion occurs when the

court's ruling is “clearly against the logic of the circumstances then before the trial court and is

 14
so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of

careful deliberate consideration.” Mansil v. Midwest Emergency Med. Servs., 554 S.W.3d 471,

475 (Mo. App. W.D. 2018). This Court reviews for prejudice, not mere error, and will reverse

only if the error was so prejudicial that it deprived the defendant of a fair trial. State v. Rogers,

529 S.W.3d 906, 910 (Mo. App. E.D. 2017).

 Analysis

 The trial court agreed with State v. Carter, 559 S.W.3d at 96, finding a “learned treatise”

can be used to challenge an expert’s credibility on cross-examination, but holding the proponent

must lay a foundation with evidence that the text or treatise is authoritative. Otherwise, the

writings are inadmissible hearsay offered to prove the truth of the matter asserted as independent

evidence of the facts asserted in the text. Id. To establish a writing as authoritative, one must

demonstrate (1) a concession of the witness; (2) judicial notice; or (3) other experts. Id.

“Judicial notice must be exercised cautiously and must be declined if there is doubt about the

notoriety of a fact.” State v. Martin, 388 S.W.3d 528, 535 (Mo. App. S.D. 2012).

 Carter contested the lack of judicial notice on the authoritative nature of the NAS report,

but the Court ruled the authentication of a document provided no support on the authoritative

nature of the report. Carter, 559 S.W.3d at 96. Moreover, the Court noted that the expert

specifically testified that the NAS report was not authoritative by any sanctioning body and was

simply considered a “research report.” Id. at 97. The Court held Carter failed to establish the

trial court abused its discretion in refusing to allow the use of the NAS report during cross-

examination of the State’s fingerprint expert. Id.

 Similarly in the record before us, Appellant failed to present any evidence establishing

that the reports were authoritative. Menendez made no concession and would have testified that

 15
the reports were not authoritative, but were flawed. Moreover, the trial court refused to take

judicial notice of the reports based merely on defense counsel’s argument against the State’s

expert. Appellant had no expert to support his position. Thus, the trial court cautiously refused

to exercise judicial notice and did not abuse its discretion in refusing to allow the hearsay reports

and their contents to be referenced for purposes of cross-examination.

 Furthermore, Appellant argues the prohibition of cross-examining Menendez regarding

the NAS and PCAST reports prevented evidence of the findings, reliability, or error rates of

toolmark and firearm examinations. We disagree. The trial court excluded the reports and their

contents but did not deny defense counsel from asking questions about the flaws in toolmark and

firearm examination as Appellant argues. In fact, the record demonstrates that cross-examination

of Menendez reveals the subjective rather than quantifiable nature of toolmark and firearm

examination as well as the lack of certainty in its findings. The defense asked Menendez about

cognitive bias and the potential for confirmation bias based on the “hit” in the NIBIN system.

We find Appellant was fully able to cross-examine Menendez regarding the issues he raised,

without specifically referring to the NAS and PCAST reports.

 The trial court did not abuse its discretion in refusing to allow Appellant to use

inadmissible hearsay reports to cross-examine Menendez. Point III is denied.

 Point IV

 Appellant’s fourth point alleges the trial court erred and abused its discretion when it

denied his request for a Daubert hearing regarding the State’s use of toolmark examination

expert testimony and allowing the admission of this testimony in violation of his right to due

process of law and right to a fair trial, as guaranteed by the Fifth, Sixth, and Fourteenth

Amendments to the U.S. Constitution and Article I, Sections 10 and 18(a) of the Missouri

 16
Constitution. Appellant alleges the court allowed the State to call Menendez to testify to a match

between a shell casing located at the murder scene and a firearm recovered from Appellant’s

girlfriend’s home. Appellant alleges this testimony failed to meet the Daubert standard and he

was prejudiced by the court’s failure to grant a Daubert hearing. Appellant further alleges the

admission of Menendez’s testimony that the gun and shell casings were a match was not

harmless and there was not overwhelming evidence of guilt. Appellant urges this Court to

reverse his convictions and sentences and remand for a new trial.

 Standard of Review

 “A trial court enjoys considerable discretion in the admission or exclusion of evidence,

and, absent clear abuse of discretion, its action will not be grounds for reversal.” Revis v.

Bassman, 604 S.W.3d 644, 649 (Mo. App. E.D. 2020), transfer denied (Sept. 1, 2020)

(citing Koelling v. Mercy Hosps. E. Cmtys., 558 S.W.3d 543, 550 (Mo. App. E.D. 2018) (internal

quotation omitted)). We review a trial court's decision to admit expert testimony for abuse of

discretion. State v. Rogers, 529 S.W.3d 906, 910, 917 (Mo. App. E.D. 2017). An abuse of

discretion occurs when the court's ruling is clearly against the logic of the circumstances then

before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of

justice and indicates a lack of careful deliberate consideration. Mansil, 554 S.W.3d at 475. The

burden is on the appellant to prove the trial court abused its discretion and prejudice

resulted. Matter of Care & Treatment of Lester Bradley v. State, 554 S.W.3d 440, 452 (Mo.

App. W.D. 2018).

 Analysis

 “[A]ll you really need to know about the admissibility of expert testimony in civil

proceedings” is in the “straightforward statutory words” in Section 490.065. State Bd. of

 17
Registration for Healing Arts v. McDonagh, 123 S.W.3d 146, 160 (Mo. banc 2003) (J. Wolff,

concurring in part and dissenting in part). The statute allows admission of expert opinion

testimony where “scientific, technical or other specialized knowledge will assist the trier of fact .

. . ” Id. If the facts and data on which the opinion is based are “of a type reasonably relied upon

by experts in the field in forming opinions or inferences upon the subject” and are “otherwise

reasonably reliable,” the expert’s opinion is admissible under the statute. Section 490.065.3. 4

A formal Daubert hearing is not required by statute. Revis, 604 S.W.3d at 656 n.6. The statute

imposes an independent duty on the court to determine whether the facts and data relied on are

otherwise reasonably reliable. McDonagh, 123 S.W.3d at 157. Even under the Federal Rules of

Evidence (FRE), federal courts have rejected claims that a trial court abuses its discretion by

failing to hold an evidentiary hearing prior to its Daubert ruling, because “[a]lthough in

limine hearings are generally recommended prior to Daubert determinations, they are not

required. The only legal requirement is that the parties ‘have an adequate opportunity to

be heard’ before the district court makes its decision.” Revis, 604 S.W.3d at 656 n.6 (citing Grp.

Health Plan, Inc. v. Philip Morris USA, Inc., 344 F.3d 753, 761 n.3 (8th Cir. 2003) (internal

citations omitted).

 An inquiry about admissible evidence is to be flexible, and no single factor is necessarily

dispositive of the reliability of a particular expert’s testimony. State ex rel. Gardner v. Wright,

562 S.W.3d 311, 319 (Mo. App. E.D. 2018). Under Daubert, reliable evidence is determined

based on (1) whether the expert’s theory can be and has been tested; (2) whether the theory has

4
 Section 490.065.2, RSMo Cum. Supp. 2017, amended in 2017, provides that a qualified expert may testify to an
opinion in a criminal case if:
 (a) The expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand
the evidence or to determine a fact in issue;
 (b) The testimony is based on sufficient facts or data;
 (c) The testimony is the product of reliable principles and methods; and
 (d) The expert has reliably applied the principles and methods to the facts of the case[.]

 18
been subject to peer review and publication; (3) the known or potential rate of error of the

particular scientific technique; and (4) whether the technique is generally accepted in the

scientific community. 509 U.S. at 593-94.

 In Revis, the appellant argued the trial court erred in failing to hold a hearing on an expert

witness’s qualifications. 604 S.W.3d at 656 n.6. The trial court noted she had an opportunity to

be heard on her expert witness challenge in both her motion in limine and at the motion hearing,

thus the argument had no merit. Id. Moreover, in finding the expert testimony sufficiently met

the reliability standard, the Court noted an expert may “draw a conclusion from a set of

observations based on extensive and specialized experience.” Id. at 655 (quoting State ex rel.

Gardner, 562 S.W.3d at 319) (internal quotation omitted). Importantly, “the trial court's role as

gatekeeper under the federal rules and our statute is not intended to serve as a replacement for

the adversary system.” Revis, 604 S.W.3d at 656 (quoting Wright, 562 S.W.3d at 322). “Any

weakness in the factual underpinnings of the expert's opinion . . . goes to the weight that

testimony should be given and not its admissibility.” Kivland v. Columbia Orthopaedic Group,

LLP, 331 S.W.3d 299, 311 (Mo. banc 2011) (quoting Elliott v. State, 215 S.W.3d 88, 95 (Mo.

banc 2007)).

 Here, after the trial court denied Appellant’s request for a Daubert hearing, the court

heard argument during the pre-trial hearing on the State’s motion in limine on a related challenge

to the credibility and reliability of toolmark identification procedures that would be discussed by

Menendez. The State wanted to prevent Appellant from cross-examining its toolmark expert

using the NAS and PCAST reports as authority to criticize the procedures that Appellant had

previously challenged in his request for Daubert hearing. Moreover, the court deemed this pre-

trial conference a “miniature Daubert hearing.”

 19
 Additionally, during trial, Menendez’s testimony on toolmark and firearm examination

was backed by his 20 years of experience in the field using these identification principles and

methods. He explained his procedures and the data he obtained. Menendez testified regarding

the “match” between the recovered gun and shell casing located at the murder scene and drew

conclusions based on his experience and observations. He was subject to extensive cross-

examination demonstrating the findings were associations rather than exact matches, and the

examinations were more subjective than quantitative. However, his findings were supported by

a verification process in which two other qualified examiners agreed with him. A Daubert

hearing was not required to admit Menendez’s testimony, which we find sufficiently reliable.

See State v. Boss, 577 S.W.3d 509, 518-19 (Mo. App. W.D. 2019) (holding toolmark

examination evidence was sufficiently reliable, even if results somewhat rely on a “subjective

analysis” and the examiner’s expertise and experience). The trial court did not abuse its

discretion by failing to have a hearing. Moreover, any weakness in Menendez’s testimony went

to its weight and not its admissibility.

 The trial court did not err in denying Appellant’s request for a Daubert hearing regarding

the State’s use of toolmark examination expert testimony and allowing admission of Menendez’s

testimony. Point IV is denied.

 Point V

 Fifth and finally, Appellant alleges the trial court erred in denying his motion for

judgment of acquittal at the close of all of the evidence, and in denying the motion for new trial,

because the cumulative effect of all the errors in Points I through IV resulted in a miscarriage of

justice in that the trial court’s rulings prohibited Appellant from effectively and appropriately

cross-examining the State’s toolmark and ballistic expert, Officer Menendez, about evidence of

 20
the examiner’s error rate, inappropriately allowed the State’s expert to testify about the shell

casing and gun being a match (without allowing defense counsel to ask about false positive

rates), and erroneously denied Appellant’s request for a Daubert hearing, in violation of

Appellant’s right to confrontation of witnesses, right to due process, and right to a fair trial, as

guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution and Article

I, Sections 10 and 18(a). Appellant urges the Court to reverse his convictions and remand for a

new trial.

 Standard of Review

 As explained in the first two points on appeal, the standard for reviewing the trial court’s

denial of a motion for judgment of acquittal is a determination whether the State presented

sufficient evidence to make a submissible case, such that a reasonable juror may have found the

defendant guilty beyond a reasonable doubt. Johnson, 244 S.W.3d at 152. This Court views the

evidence in the light most favorable to the judgment, disregarding any contrary evidence, and

grants the State all reasonable inferences from the evidence. Id. We give deference to the jury

as the trier of fact, in their superior position, to assess the credibility of witnesses and the weight

and value of their testimony. Id.

 Analysis

 “An appellate court may grant a new trial based on the cumulative effects of errors, even

without a specific finding that any single error would constitute grounds for a new trial.” State v.

West, 551 S.W.3d 506, 525 (Mo. App. E.D. 2018) (citing Koontz v. Ferber, 870 S.W.2d 885, 894

(Mo. App. W.D. 1993)). “However, relief will not be granted for cumulative error when there is

no showing that prejudice resulted from any rulings of the trial court.” Id. Here, in his identified

points on appeal, Appellant “has failed to persuasively identify any error during the trial, [and

 21
therefore] the point must fail.” Giles v. Riverside Transp., Inc., 266 S.W.3d 290, 300 (Mo. App.

W.D. 2008). Additionally, given the evidence of guilt presented at trial, Appellant fails to show

that the alleged errors resulted in manifest injustice. Koontz, 870 S.W.2d at 894. Point V is

denied.

 CONCLUSION

The judgment of the trial court is affirmed.

 ____________________________________
 Lisa P. Page, Judge

Robin Ransom, P.J. and
Sherri B. Sullivan, J., concur.

 22